W. John Tietz
Catherine A. Laughner
BROWNING, KALECZYC, BERRY & HOVEN, P.C.
800 Last Chance Gulch
Helena, Montana 59601
Tel:  (406) 443-6820
Fax:  (406) 443-6883
Email:  john@bkbh.com
          cathyl@bkbh.com

Eliot Lauer (*pro hac vice* pending)
Charles B. Howland (*pro hac vice* pending)
Michael P. Jones (*pro hac vice* pending)
CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
101 Park Avenue
New York, New York 10178-0061
Tel:  (212) 696-6000
Fax:  (212) 697-1559
Email: elauer@curtis.com
          chowland@curtis.com
          mjones@curtis.com

*Attorneys for Plaintiff*
*Columbia Falls Aluminum Company, LLC*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA, MISSOULA DIVISION

| | |
|---|---|
| COLUMBIA FALLS ALUMINUM COMPANY, LLC | Case No. CV _____ |
| Plaintiff, | |
| - against - | **COMPLAINT** |
| ATLANTIC RICHFIELD COMPANY | |
| Defendant. | |

Plaintiff Columbia Falls Aluminum Company, LLC ("CFAC") makes the following allegations upon information and belief, except those allegations specifically referring to CFAC, which it makes based upon its own knowledge:

## NATURE OF THE ACTION

1.     This is an action under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601 *et seq.* ("CERCLA"), and the Montana Comprehensive Environmental Cleanup and Responsibility Act, Montana Code Annotated §§ 75-10-701 *et seq.* ("CECRA"), through which CFAC seeks contribution from defendant Atlantic Richfield Company ("Arco") for the expenses CFAC has incurred, and will continue to incur, responding to releases and threatened releases of hazardous substances at an aluminum reduction plant and its surrounding properties located approximately two miles northeast of Columbia Falls, Montana, near Teakettle Mountain (the "Site").

2.     From 1955 until 1985, Arco, or its corporate predecessor, owned and operated the Site.  During its ownership and operation, Arco was responsible for the disposal and release of significant amounts of hazardous substances into the surrounding environment, including, among others, cyanide, fluoride, and polycyclic aromatic (alternatively polyaromatic) hydrocarbons ("PAHs").

3.     CFAC is the current owner of the Site and, since 2013, has incurred substantial expenses, both before and after voluntarily entering into an

Administrative Order on Consent with the United States Environmental Protection Agency ("EPA"), investigating releases of hazardous substances at the Site.

4.     To date, Arco has refused to contribute toward any portion of the response costs that CFAC has, and will, incur.  Accordingly, this action seeks to require Arco to contribute to the response costs that CFAC has incurred or will incur responding to Arco's disposal and release of hazardous substances.

## THE PARTIES

5.     Plaintiff CFAC is a limited liability company organized under the laws of the state of Delaware, with its principal place of business in Columbia Falls, Montana.

6.     Defendant Arco is a corporation organized under the laws of the state of Delaware.  Arco was an "owner" and "operator" of a "facility" at the time of disposal pursuant to 42 U.S.C. §§ 9601(9) and (20), and 9607(a)(2).  Arco is also a "person" within the meaning of 42 U.S.C. § 9601(21).

## JURISDICTION AND VENUE

7.     This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1391, as plaintiff asserts claims arising under CERCLA.

8.     This Court has subject-matter jurisdiction over the claims brought under Montana state law by virtue of the supplemental jurisdiction authority

provided in 28 U.S.C. § 1367(a).  The state law claims asserted herein arise from the same nucleus of operative facts as the federal law claims.  Moreover, the state law and federal law claims are so intertwined that it is appropriate for this Court to exercise its jurisdiction over the state law claims.

9.     Venue is proper in the United States District Court for the District of Montana pursuant to 28 U.S.C. §1391(b)(2) and 42 U.S.C. § 9613(b) because the claims arose, and the threatened and/or actual disposal and releases of hazardous substances occurred within, the District of Montana.

10.     Upon filing this Complaint, CFAC provided a copy of this Complaint to the Attorney General of the United States and to the Administrator of EPA as required by 42 U.S.C. § 9613(l).

## FACTS

### I.     Arco's Ownership and Operation of the Aluminum Smelter Site

11.     In 1955, the Anaconda Copper Mining Company ("Anaconda") completed construction of, and began production of aluminum at, the Site.[1]

12.     In 1982, Anaconda merged with and into Arco, assuming all of Anaconda's assets and liabilities, including the Site.[2]  Accordingly, for the remainder of this Complaint, Anaconda and Arco will be referred to as the singular "Arco."

---

[1]     See, e.g., Arco Metals Company Facilities Manual dated May 1, 1983, at 3.  A copy of the Arco Metals Company Facilities Manual is attached to this Complaint as **Exhibit A**.

[2]     See, e.g., **Ex. A** - Arco Metals Company Facilities Manual, at 5.

13.     From 1955 to 1985, Arco produced approximately 3,523,501 tons of aluminum at the Site using the Hall-Héroult process.[3]  The Hall-Héroult process is an electrolytic reduction process that dissolves alumina in a cryolite bath inside of carbon-lined cells, or "pots."  The pots are arranged in lines, which are known as "potlines," and the potlines are arranged in rooms known as "potrooms" at the Site.

14.     In the Hall-Héroult process, a powerful electric current is passed through the bath from an anode at the top to a cathode at the bottom, which separates the aluminum metal from the chemical solution.

15.     Arco's production of aluminum at the Site in this manner created several waste streams which Arco discharged onto the ground in various landfills, ponds, and other areas of the Site, which in turn have caused releases and threatened releases of hazardous substances at the Site.

### A.     Arco Disposed of Hazardous Substances In, Around, and Under the West Landfill

16.     Arco disposed of hazardous substances in the "West Landfill," which is identified in the map of the Site immediately below.

---

[3]     See, e.g., the Site's Production and Consumption Reports, a copy of which are attached to this Complaint as **Exhibit B**.



17.     One waste that Arco disposed of in the West Landfill was spent

potliners, or "SPL."  Arco generated SPL when, after utilizing a pot in a potline for

a number of years, the carbon-lining, or "potliner," in the pot failed.[4]  The failed

carbon liners, which Arco removed from the potroom, contained hazardous

substances including cyanide, among others.[5]

18.     From 1955 until 1970, Arco disposed approximately 50,000 tons of

SPL into the West Landfill.[6]

19.     In addition, when Arco transported SPL and other materials for

disposal in the West Landfill, Arco spilled and disposed such materials in the areas

immediately surrounding the West Landfill.  Some of these materials included

hazardous substances, including high quantities of PAHs.

20.     In 1981, Arco closed, capped, and revegetated the West Landfill.[7]

21.     Since 1981, the West Landfill has not been used for the disposal of

materials containing hazardous substances.

### B.     Arco Disposed of Hazardous Substances In, Around, and Under the Center Landfill

22.     Arco disposed of hazardous substances in the "Center Landfill,"

which is identified in the map of the Site immediately below.

---

[4]     See, e.g., a Site Hydrological Data Summary dated February 28, 1992, at 11.  A copy of the Hydrological Data Summary is attached to this Complaint as **Exhibit C**.

[5]     See, e.g., a Site report titled Spent Potliner Disposal at the Columbia Falls Aluminum Company dated January 26, 1990.  A copy of this report is attached to this Complaint as **Exhibit D**.

[6]     See, e.g., **Ex. C** - Hydrological Data Summary, at 11; see also Columbia Falls Aluminum Company's Storm Water Pollution Prevention Plan dated September 11, 1998, at 3.  A copy of the Storm Water Pollution Prevention Plan is attached to this Complaint as **Exhibit E**.

[7]     See, e.g., **Ex. C** - Hydrological Data Summary, at 11.



23.     Like the West Landfill, Arco also used the Center Landfill to dispose of SPL generated by Arco's aluminum production process.   From 1970 to 1980, Arco disposed approximately 50,000 tons of SPL into the Center Landfill.[8]

24.     In addition, when Arco transported SPL and other materials for disposal in the Center Landfill, Arco spilled and disposed of other materials in the areas immediately surrounding the Center Landfill.  Some of these materials included hazardous substances, including high quantities of PAHs.

25.     In 1981, Arco closed, capped, and revegetated the Center Landfill.[9]

26.     Since 1981, the Center Landfill has not been used for the disposal of materials containing hazardous substances.

**C.     Arco Disposed of Hazardous Substances In, Around, and Under the Wet Scrubber Sludge Pond**

27.     Arco disposed of wet scrubber sludge into an area known as the "Wet Scrubber Sludge Pond," which is identified in the map of the Site immediately below.

---

[8]     See, e.g., **Ex. C** - Hydrological Data Summary, at 11; **Ex. E** - Storm Water Pollution Prevention Plan, at 4.

[9]     See, e.g., **Ex. C** - Hydrological Data Summary, at 11.



28.     From 1955 through 1978, Arco generated the wet scrubber sludge that was disposed of in the Wet Scrubber Sludge Pond by using a "wet scrubber" system inside the Site's potrooms.[10]

---

[10]     See, e.g., a Site report titled Basic Dry Scrubber Operations, a copy of which is attached to this Complaint as **Exhibit F**.

29.     Arco utilized a wet scrubber system in the potrooms at the Site in an attempt to capture gases, some of which included PAHs, fluoride, and other hazardous substances, that were emitted during the aluminum production process.[11] The scrubbers sprayed the gases with a lime slurry, which combined into a sludge.[12]  Arco then pumped that sludge to the Wet Scrubber Sludge Pond.  This sludge contained hazardous substances including fluoride and PAHs, among others.

30.     In 1978, Arco replaced the wet scrubbers with more state-of-the-art dry scrubbers.[13]  The dry scrubbers operated similarly to the wet scrubbers, but rather than spraying the gases (which created sludge), the gases were forced through dry alumina ore with which the gases reacted and created $AlF_3$.  The $AlF_3$ was then recycled for use in the aluminum production process.[14]  As a result, the potrooms did not generate any additional wet scrubber sludge waste after 1978.[15]

---

[11]     See, e.g., **Ex. F** - Basic Dry Scrubber Operations.

[12]     See, e.g., **Ex. F** - Basic Dry Scrubber Operations; see also the Agreement and Plan of Merger among Columbia Falls Aluminum Company and Brack Ducker and Jerome Broussard and Glencore AG, et al. dated April 9, 1999, at Exhibit 2.01(u)(23).  A copy of the Agreement and Plan of Merger is attached to this Complaint as **Exhibit G**.

[13]     See, e.g., **Ex. G** - Agreement and Plan of Merger, at Exhibit 2.01(u)(23).

[14]     See, e.g., **Ex. F** - Basic Dry Scrubber Operations.

[15]     See, e.g., **Ex. A** - Arco Metals Company Facilities Manual, at IV-10.

31.     The Wet Scrubber Sludge Pond was closed in 1981, and no further wet scrubber sludge has been deposited in the pond since.[16]

### D.    Arco Disposed of Hazardous Substances In, Around, and Under the North Percolation Ponds

32.     Arco disposed of hazardous substances in a "North-East Percolation Pond," a "Diversion Ditch," and a "North-West Percolation Pond" (collectively, the "North Percolation Ponds"), which are identified in the map of the Site immediately below.



---

[16]     See, e.g., **Ex. C** - Hydrological Data Summary, at 11.

33.     From 1964 to 1977, after a potliner failed, Arco soaked the resulting SPL with water to cool the SPL before transport to the West Landfill and Center Landfill (collectively, the "SPL Landfills").[17]

34.     Arco then discharged the water used to soak the SPL, approximately 180,000,000 gallons in total, into the North-East Percolation Pond.[18]

35.     This water contained several hazardous substances, including cyanide, fluoride, and PAHs.

36.     In addition, for the entire duration of Arco's operations at the Site, Arco utilized a separate paste plant (the "Paste Plant") to convert raw petroleum coke and tar pitch into briquettes.  Petroleum coke and tar pitch are carbon-rich solid materials which contain PAHs or compounds that under the proper chemical circumstances could become PAHs.  Arco used the briquettes manufactured at the Paste Plant to form anodes, which Arco then used in the Hall-Héroult process to reduce aluminum.[19]

---

[17]     See, e.g., Columbia Falls Aluminum Company's Analytical Results Report dated February 7, 1989, at 4.  A copy of the Analytical Results Report is attached to this Complaint as **Exhibit H**.  See also Letter from Kenneth G. Reick to Frederick C. Shewman, P.E., dated June 29, 1983.  A copy of this letter is attached to this Complaint as **Exhibit I**.

[18]     See, e.g., **Ex. C** - Hydrological Data Summary, at 17-18.

[19]     See, e.g., **Ex. A** - Arco Metals Company Facilities Manual, at I-3.

37.     Arco tracked its historic carbon consumption in annual consumption reports.  These reports show that during its ownership and operation of the Site, Arco used approximately 2,105,151 tons of carbon.[20]

38.     Because Arco's manufacturing process involved moving large quantities of electricity and heat through the anodes, the anodes would slowly decay.  This, in turn, created a gaseous discharge from the anodes (which were made up of briquettes containing PAHs, among other substances).

39.     Arco attempted to control these gases by routing them through a wet scrubber system.  In the wet scrubber system, Arco would spray the high-PAH gaseous discharge with water, which generated a slurry high in PAHs.  Arco then discharged that slurry into the North-East Percolation Pond.[21]  Arco would also route any overflow of the North-East Percolation Pond through the Diversion Ditch into the North-West Percolation Pond.[22]

**E.     Arco Disposed of Hazardous Substances In, Around, and Under the Paste Plant and Raw Materials Loading and Unloading Area**

40.     Arco caused the release of hazardous substances in and around the "Raw Materials Loading and Unloading Area," otherwise referred to as the "Raw

---

[20]      See, e.g., **Ex. B** - Production and Consumption Reports.

[21]      See, e.g., Letter from Kenneth G. Reick to John Arrigo dated April 10, 1989.  A copy of this letter is attached to this Complaint as **Exhibit J**.

[22]      See, e.g., **Ex. C** - Hydrological Data Summary, at 17.

Materials Area," and the Paste Plant, which are identified in the map of the Site

immediately below.



     41.    Throughout the entire duration of Arco's ownership and operation of

the Site, Arco imported petroleum coke and coal tar pitch, which, as noted above,

Arco used as input materials for the production of anodes that were then used in the aluminum reduction process.[23]

42.     Arco stored the imported petroleum coke and coal tar pitch, which are high carbon content materials containing PAHs and other hazardous substances, in uncovered piles in and around the Raw Materials Area.

43.     Arco then moved the petroleum coke and coal tar pitch to the Paste Plant for manufacturing.  The materials again were unloaded around the Paste Plant, and were released into the surrounding environment.

**F.     Arco Disposed of Cast Cooling Water and Sewage Treatment Effluent In, Around, and Under the South Percolation Ponds**

44.     From 1963 to 1985, Arco disposed of cast cooling water and sewage treatment effluent in and around the area known as the "South Percolation Ponds," which are identified in the map of the Site immediately below.[24]

---

[23]     See, e.g., **Ex. A** - Arco Metals Company Facilities Manual, at I-3.

[24]     See, e.g., **Ex. H** - Analytical Results Report, at 4.



## II.   CFAC's Operation of the Site

45.     In 1985, Arco formed Columbia Falls Aluminum Company, a Montana Corporation ("CFAC Montana"), and transferred the Site to CFAC Montana.

46.     That same year, Montana Aluminum Investors Corp. ("MAIC") bought CFAC Montana.

47.     In 1989, MAIC merged with CFAC Montana, leaving CFAC Montana as the surviving entity.

48.     CFAC Montana produced approximately 2,380,973 tons of aluminum from 1985 to 1998.[25]

49.     In 1999, CFAC purchased the shares of, and merged with, CFAC Montana.

50.     CFAC produced aluminum at the Site from 1999 until 2009.  During this time period, CFAC produced approximately 810,755 tons of aluminum.[26]

51.     Both CFAC Montana's and CFAC's production of aluminum at the Site caused substantially fewer releases or threatened releases of hazardous substances than Arco's ownership and operation of the Site did.

52.     For example, CFAC Montana only disposed of SPL on-site from 1985 to 1990 in a landfill lined with a thick clay pad (from 2 feet to 5 feet).[27]

---

[25]     See, e.g., **Ex. B** - Production and Consumption Reports.

[26]     See, e.g., **Ex. B** - Production and Consumption Reports.

53.     In 1990, CFAC Montana capped and revegetated that landfill. Afterward, CFAC Montana shipped its SPL off-site to a hazardous wastes landfill.[28]

54.     CFAC also did not dispose of SPL in the unlined SPL Landfills. Rather, CFAC, like CFAC Montana, shipped its SPL offsite from 1999 to 2009 – the entire period that CFAC owned and operated the Site.[29]

55.     CFAC Montana and CFAC exclusively utilized the more efficient and environmentally friendly Sumitomo process in producing aluminum, which reduced the total amount of PAH emissions at the Site.[30]

56.     Further, CFAC Montana and CFAC exclusively employed dry scrubbers in the potrooms at the Site.  The dry scrubbers utilized by CFAC Montana and CFAC were more efficient at capturing gaseous PAHs, fluoride, and other hazardous substances that built up in the pots during the aluminum production process, compared with the wet scrubbers utilized by Arco between 1955 and 1978.  The dry scrubbers utilized by CFAC Montana and CFAC also did not produce any sludge to be disposed of in the Wet Scrubber Sludge Pond.[31]

---

[27]     See, e.g., **Ex. C** - Hydrological Data Summary, at 11.

[28]     See, e.g., **Ex. C** - Hydrological Data Summary, at 10-11.

[29]     See, e.g., **Ex. C** - Hydrological Data Summary, at 10.

[30]     See, e.g., **Ex. A** - Arco Metals Company Facilities Manual, at 7.

[31]     See, e.g., **Ex. G** - Agreement and Plan of Merger, at Exhibit 2.01(u)(23); **Ex. F** - Basic Dry Scrubber Operations.

57.     In addition, CFAC only used a dry coke scrubber system at the Paste Plant as the wet scrubber system had been replaced in 1999.[32]  The dry coke scrubber allowed coke particles to absorb gases created during the anode production process and then recycled them back into the manufacturing process.[33] This process did not generate a wet slurry like the scrubbers utilized by Arco.

58.     Since 1999, CFAC has not discharged any wet scrubber waste from the Paste Plant's wet scrubbers into the North Percolation Ponds.

## III.    CFAC Begins to Investigate the Release of Hazardous Substances and to Engage with State and Federal Authorities

59.     On March 5, 2013, EPA began an investigation of the Site for possible listing on the National Priorities List ("NPL").  Pursuant to its authority, EPA hired Weston Solutions, Inc. ("Weston"), which proceeded to conduct a site reassessment of the Site.  In response, CFAC hired its own consultants to participate in EPA's investigative process.

60.     On April 4, 2014,  Weston submitted its *Site Reassessment for Columbia Falls Aluminum Company Aluminum Smelter Facility Columbia Falls, Flathead County, Montana* ("Site Reassessment"), detailing its investigations of

---

[32]     See, e.g., Letter from Steve Wright, PE, to Tim Byron dated December 29, 1998.  A copy of this letter is attached to this Complaint as **Exhibit K**.

[33]     See, e.g., Letter from Steve Wright, PE, to Mike Pasichnyk dated November 9, 1998.  A copy of this letter is attached to this Complaint as **Exhibit L**.

the Site.[34]  The investigations revealed that hazardous substances including, among

others, cyanide and fluoride, had been released into the surrounding environment.[35]

The investigations also identified cyanide at an off-site drinking water well down-

gradient from the Site that exceeded applicable screening levels.[36]

61.    After Weston submitted the Site Reassessment, CFAC began to work

with EPA and Montana Department of Environmental Quality ("Montana DEQ")

to respond to the contamination that Weston's investigation had identified.

62.    On May 23, 2014, CFAC participated in a teleconference with EPA

and Montana DEQ.  In that call, CFAC, EPA, and Montana DEQ officials

discussed the results of EPA's investigation to date, as well as further investigation

needs and potential regulatory actions that could be asserted under CERCLA or

Montana's state-law analogue, CECRA.[37]

63.    On July 8, 2014, CFAC met with EPA and Montana DEQ in Helena,

Montana to discuss the next steps for addressing the releases of hazardous

---

[34]    A true and correct copy of the relevant excerpts of the Site Reassessment is attached to this Complaint as **Exhibit M**.

[35]    **Ex. M** - Site Reassessment, at 37.

[36]    **Ex. M** - Site Reassessment, at 42.

[37]    See Email from Robert Parker of EPA to Steve Wright, Jenny Chambers, and others dated May 22, 2014. A copy of this email is attached to this Complaint as **Exhibit N**.

substances at the Site.  At that meeting, CFAC, EPA, and Montana DEQ agreed that Montana DEQ would later present a proposal for addressing the releases.[38]

64.     On July 31, 2014, Montana DEQ sent CFAC an email, which explained Montana DEQ's proposed approach and enclosed a draft Administrative Order on Consent and letter.[39]  Through this exchange, Montana DEQ gave CFAC written notice under 75-10-711 of CECRA that CFAC was liable for remedial actions pursuant to § 75-10-715, Montana Code Annotated.[40]

65.     In response to its meetings with EPA and Montana DEQ, on August 14, 2014, CFAC hired Roux Associates, Inc. ("Roux").  Roux was hired to prepare a Remedial Investigation/ Feasibility Study Work Plan (a "RI/FS Work Plan") with respect to the Site, which could assist CFAC in identifying releases of hazardous substances at the Site, and then developing a method for responding to those releases.

66.     Unable to agree to an Administrative Order on Consent with Montana DEQ, however, CFAC reached out to EPA in November 2014 to note its desire to

---

[38]     See Email from Jenny Chambers to Cheryl Driscoll dated July 31, 2014.  A copy of this email is attached to this Complaint as **Exhibit O**.

[39]     **Ex. O** - Email from Jenny Chambers (July 31, 2014).  See also Proposed *Administrative Order on* Consent, an attachment to the July 31, 2014 email from Jenny Chambers, which is attached to this Complaint as **Exhibit P**, and a Letter from Jenny Chambers to Cheryl Driscoll dated July 31, 2014, which is attached to this Complaint as **Exhibit Q**.

[40]     **Ex. O** - Email from Jenny Chambers (July 31, 2014).

begin discussions about entering into an Administrative Order on Consent with

EPA regarding assessment activities at CFAC.

67.     Negotiations with Montana DEQ ended in December 2014.[41]

68.     On February 25, 2015, CFAC contacted Arco to inform it that CFAC

would soon begin to negotiate an Administrative Order on Consent with EPA to

address the contamination that had been identified at the Site.  In that same letter,

CFAC told Arco that it welcomed any views that Arco had with respect to the Site.

69.     On June 8, 2015, CFAC contacted EPA in order to reiterate its interest

in discussing an Administrative Order on Consent to conduct an investigation and

evaluate options with EPA, and to notify EPA that CFAC had already prepared an

RI/FS Work Plan for public comment.

70.     On June 9, 2015, EPA sent a letter to Arco and CFAC.  EPA's letter

demanded that CFAC and Arco, as "potentially responsible parties," or "PRPs,"

pay the responses costs EPA had incurred responding to releases and threatened

releases of hazardous substances at the Site.[42]

---

[41]     See, e.g., *Columbia Falls Aluminum Company Site*, MONT. DEP'T ENVTL. QUALITY, http://deq.mt.gov/DEQAdmin/cfac (last visited May 18, 2018), a screenshot of which is attached to this Complaint as **Exhibit R**.

[42]     See Letter from Kelcey Land and Andrea Madigan to Steven Wright dated June 9, 2015.  A copy of this letter is attached to this Complaint as **Exhibit S**.

71.     EPA further requested that Arco and CFAC "voluntarily negotiate a consent order" in which the parties "perform a remedial investigation and feasibility study . . . under EPA's oversight at the Site."[43]

72.     On June 25, 2015, CFAC accepted EPA's invitation to negotiate an Administrative Order on Consent ("AOC") to conduct a remedial investigation and feasibility study.[44]

73.     In contrast, by letter dated June 25, 2015, Arco rejected EPA's invitation to engage in negotiating the AOC, leaving 100 percent of the burden and financial costs on CFAC.[45]

74.     CFAC incurred significant response costs between 2013 and November 30, 2015, in order to monitor, assess, and evaluate the environmental threat caused by contaminants at and around the Site (the "Pre-AOC Costs").

75.     To date, Arco has refused to reimburse CFAC for any of the Pre-AOC Costs.

76.     Arco further refused to reimburse EPA for any of its expenses incurred to date, despite EPA's demand of Arco to do so.[46]  EPA's costs had already amounted to $743,133.86.[47]

---

[43]     See **Ex. S** - Letter from Kelcey Land (June 9, 2015).

[44]     See Letter from Steve Wright to Kelcey Land and Andrea Madigan dated June 25, 2015.  A copy of this letter is attached to this Complaint as **Exhibit T**.

[45]     See Letter from Cord Harris to Kelcey Land and Andrea Madigan dated June 25, 2015, at 2.  A copy of this letter is attached to this Complaint as **Exhibit U**.

## IV.    CFAC Agrees to Conduct an RI/FS

77.    On November 23, 2015, EPA approved CFAC's *Remedial Investigation/Feasibility Study Work Plan* ("RI/FS Work Plan"), prepared by Roux.  The RI/FS Work Plan and its relevant appendix are attached as **Exhibit W**.

78.    In turn, on November 30, 2015, CFAC entered into an AOC with EPA concerning the Site.  Pursuant to the AOC, CFAC is conducting a remedial investigation and feasibility study at the Site (the "RI/FS") as outlined in the RI/FS Work Plan, which EPA included as Appendix A to the AOC.  The AOC is attached as **Exhibit X**.

## V.    CFAC's Investigations Reveal Arco's Responsibility
## for the Disposal and Release of Hazardous Substances

79.    The RI/FS Work Plan identified several source areas for contaminants of potential concerns ("COPCs"), *i.e.*, cyanide, fluoride and PAHs, that required investigation, as well as a framework through which Roux could perform its investigation.

80.    From 2015 to 2017, Roux performed the first stage of its investigation, termed the "Phase I Site Characterization," which was intended to "identify and/or confirm source areas and associated COPCs, as well as provide a

---

[46]     **Ex. S** - Letter from Kelcey Land (June 9, 2015).

[47]     See the Anaconda-Attachment 4 (Cost) enclosed in Kelcey Land's June 9, 2015 letter, attached to this Complaint as **Exhibit V**.

broad characterization of the hydrogeologic conditions and the nature and extent of contamination across the Site."[48]

81.     In February 2017, Roux completed the Phase I Site Characterization, and submitted to EPA its Phase I Site Characterization Data Summary Report ("Data Summary Report").  A copy of the Data Summary Report and its relevant figures and plates is attached as **Exhibit Y**.

82.     Roux's Data Summary Report confirmed that at the Site there were elevated concentrations of three main COPCs:  (1) cyanide, (2) fluoride, and (3) PAHs, as well as other hazardous substances.

83.     Cyanide, fluoride, and PAHs qualify as hazardous substances under CERCLA §§ 101(14) and 107(a) and as "hazardous or deleterious substance[s]" under Montana Code Annotated § 75-10-701(8).

84.     Each of the specific areas where COPCs are found at potentially hazardous levels are all closely associated with Arco's historic ownership and operation of the Site.

### A.     Arco Disposed of Cyanide, Fluoride and High PAH Materials at the West Landfill

85.     Based on Roux's sampling of the groundwater, Roux determined that the concentrations of cyanide and fluoride are highest next to the West Landfill and Wet Scrubber Sludge Pond.[49]

---

[48]     **Ex. W** - RI/FS Work Plan, at 73.

86.     The concentrations of cyanide and fluoride decrease in samples taken downgradient from the West Landfill and Wet Scrubber Sludge Pond closer towards the Flathead River, as detailed in the three maps below.[50]



---



---

52      **Ex. Y** - Data Summary Report, at Plate V2.



87.    This pattern of contamination confirms that the West Landfill and Wet Scrubber Sludge Pond "are the primary source of the elevated cyanide and fluoride concentrations in groundwater." [54]

---

[53]    **Ex. Y** - Data Summary Report, at Plate 11.

[54]    **Ex. Y** - Data Summary Report, at 85.

88.     Arco is solely responsible for depositing the materials that are the likely sources of this contamination.  Arco disposed of over 50,000 tons of SPL, which contains cyanide and fluoride, into the West Landfill.[55]

89.     The West Landfill was closed in 1981, during Arco's period of ownership,[56] and was not utilized by either CFAC or CFAC Montana for the disposal of SPL.  Rather, up and until 1990, CFAC Montana disposed of SPL in a separate lined landfill.[57]  From June 1990 onward, all SPL was shipped off-site to a hazardous wastes landfill.[58]

90.     Roux identified PAHs in and around the West Landfill, as demonstrated in the map below.

---

[55]      See, e.g., **Ex. C** - Hydrological Data Summary, at 10-11.

[56]      See, e.g., **Ex. C** - Hydrological Data Summary, at 11.

[57]      See, e.g., **Ex. C** - Hydrological Data Summary, at 11.

[58]      See, e.g., **Ex. C** - Hydrological Data Summary, at 10.



91.    The SPL that Arco disposed of in the West Landfill is made up of carbon material, which contains PAHs (in addition to cyanide and fluoride).

92.    Roux determined in its report that "the soils around the landfills have likely been impacted by the historical waste handling practices around the landfills and by aerial deposition of COPCs [like PAHs] from historical plant emissions."[60]

93.    Unlike Arco, which used the West Landfill until its closure in 1981, CFAC and CFAC Montana did not use, and had no reason to use, the West Landfill nor to handle waste with respect to a landfill that was no longer in use.

---

[59]    **Ex. Y** - Data Summary Report, at Plate N2.

[60]    **Ex. Y** - Data Summary Report, at 86.

94.     Arco is therefore responsible for most, if not all of the cyanide, fluoride, and PAH contamination in and around the West Landfill.

**B.     Arco Disposed of Cyanide, Fluoride, and
High PAH Materials in the Center Landfill**

95.     Arco is solely responsible for disposing SPL into the Center Landfill. Specifically, from 1970 to 1980, Arco disposed approximately 50,000 tons of SPL into the Center Landfill.[61]

96.     The Center Landfill was closed in 1981,[62] and was not utilized by CFAC or CFAC Montana for the disposal of SPL.

97.     Roux identified PAHs in and around the Center Landfill, as demonstrated in the map below.

---

[61]     <u>See, e.g.</u>, **Ex. C** - Hydrological Data Summary, at 11; **Ex. E** - Storm Water Pollution Prevention Plan, at 4.

[62]     <u>See, e.g.</u>, **Ex. C** - Hydrological Data Summary, at 11.



98.    CFAC and CFAC Montana had no reason to use the Center Landfill that had been closed before either party gained ownership of the Site.  Therefore, Arco is responsible for the PAH contamination in and around the Center Landfill.[64]

**C.    Arco Disposed of Fluoride and High PAH Materials in the Wet Scrubber Sludge Pond**

99.    As noted above, cyanide and fluoride concentrations are highest in groundwater samples located next to both the Wet Scrubber Sludge Pond and the West Landfill.

---

[63]    **Ex. Y** - Data Summary Report, at Plate N2.

[64]    See, e.g., **Ex. Y** - Data Summary Report, at 86.

100.   Arco utilized the Wet Scrubber Sludge Pond from 1955 to 1978 for discharging the calcium fluoride sludge it created during its production of aluminum.  Arco disposed of this calcium fluoride sludge, which contained fluoride, in the Wet Scrubber Sludge Pond from 1955 to 1978.[65]

101.   The Pond was capped and revegetated in 1981, before either CFAC or CFAC Montana acquired the property.[66]

102.   No calcium fluoride sludge was subsequently deposited in the Wet Scrubber Sludge Pond by either CFAC or CFAC Montana.  Thus, any contaminants associated with this source, *i.e.*, "fluoride within the calcium fluoride sludge,"[67] in or around the Wet Scrubber Sludge Pond were placed there by Arco.

103.   Accordingly, Arco is entirely responsible for the fluoride contamination at the Site that is currently emanating from the Wet Scrubber Sludge Pond.[68]

104.   Similarly, Roux's report identified elevated concentrations of PAHs in and around the Wet Scrubber Sludge Pond, detailed below.

---

[65]     See, e.g., **Ex. F** - Basic Dry Scrubber Operations.

[66]     See, e.g., **Ex. C** - Hydrological Data Summary, at 11.

[67]     See, e.g., **Ex. Y** - Data Summary Report, at 85.

[68]     See, e.g., **Ex. Y** - Data Summary Report, at 85.



105.    The calcium fluoride sludge Arco pumped into the Wet Scrubber

Sludge Pond contained elevated levels of PAHs, which were generated during the

production process and subsequently captured by the wet scrubber slurry.

106.    The PAHs from this process, in addition to Arco's "historical waste

handling practices,"[70] caused PAHs to accumulate in and around the Wet Scrubber

Sludge Pond.

---

[69]      **Ex. Y** - Data Summary Report, at Plate N2.

[70]      See, e.g., **Ex. Y** - Data Summary Report, at 86.

107.    CFAC and CFAC Montana never used the Wet Scrubber Sludge Pond to dispose of calcium fluoride sludge.  Arco is therefore responsible for most, if not all, of the PAH contamination in and around the Wet Scrubber Sludge Pond.

### D.    Arco Disposed of High PAH Material in the North Percolation Ponds

108.    Roux's Data Summary Report also identified numerous hot spots of elevated PAH contamination in and around the North Percolations Ponds, detailed immediately below.



109.    The PAHs located in the North Percolation Ponds are a result of Arco's and CFAC Montana's historic pumping of wet scrubber sludge from the Paste Plant into the North Percolation Ponds.

110.    Specifically, for the entirety of its operation of the Site, Arco discharged sludge from the wet scrubber system utilized at the Paste Plant (distinct from the wet scrubber in the main potrooms) into the North Percolation Ponds.[72]

111.    This sludge contained PAHs that were generated by Arco's use of PAH containing materials at the Paste Plant, which were then caught by the wet scrubbers before being emitted into the air.

112.    In contrast, during CFAC's operation of the Site, CFAC only used the dry coke scrubber installed in 1999, which did not generate a wet scrubber water slurry.[73]

**E.    Arco Caused PAH Contamination In, Around, and Under the Paste Plant and Raw Materials Area**

113.    Roux's Data Summary Report also identified numerous hot spots with elevated PAH levels in and around the Paste Plant and Raw Materials Area, detailed immediately below.

---

[72]    See, e.g., **Ex. J** - Letter from Kenneth Reick (Apr. 10, 1989).

[73]    See, e.g., **Ex. L** - Letter from Steve Wright (Nov. 9, 1998).



114.    The Data Summary Report concluded that elevated PAH levels can be "attributed to the extensive handling and storage of PAH containing materials, such as petroleum coke and pitch, that were key components of the manufacturing process."[75]

115.    Arco used the Paste Plant and Raw Materials Area during its entire operation of the Site to store imported PAH-containing materials used in the

---

[74]      **Ex. Y** - Data Summary Report, at Plate N2.

[75]      **Ex. Y** - Data Summary Report, at 88.

aluminum production process, including petroleum coke and coal tar pitch, which

caused the release of PAHs in this area.[76]

### F.  Arco Caused Cyanide, Fluoride, and PAH Contamination In, Around, and Under the South Percolation Ponds

116.  Roux further identified cyanide and fluoride in surface water samples

of the South Percolation Ponds, as detailed in the maps immediately below.



[76]      See, e.g., **Ex. A** - Arco Metals Company Facilities Manual, at I-3.

[77]      **Ex. Y** - Data Summary Report, at Figure X1.

-39-



117.   Additionally, Roux's Data Summary Report identified numerous hot

spots with elevated PAH levels in and around the South Percolation Ponds,

depicted below.

---

[78]   **Ex. Y** - Data Summary Report, at Figure X2.



118.   From 1963 to 1985, Arco released cast cooling water and sewage treatment effluent to the South Percolation Ponds, and is responsible for any resultant contamination.[80]

## VI.   CFAC Incurred and Continues to Incur Response Costs

119.   In performing all of the tasks that CFAC has been obligated to undertake under the AOC, CFAC has incurred at least $7 million in response costs to date (the "AOC Costs").

---

[79]   **Ex. Y** - Data Summary Report, at Plate N2.

[80]   See, e.g., **Ex. W** - RI/FS Work Plan, at Appendix A.

120.    CFAC will incur additional costs under the AOC, including the continued data collection, human risk assessment, site reconnaissance, well monitoring, sediment sampling, groundwater sampling, surface water sampling, ecological screening, assessment of treatment technologies, and further analysis of alternative remedial methods that might use various treatment technologies.

121.    Arco has refused to reimburse CFAC for any of the AOC Costs incurred to date.

### FIRST CLAIM FOR RELIEF
### (Cost Recovery Pursuant to CERCLA § 107(a))

122.    CFAC realleges and incorporates by reference the allegations in paragraphs 1 through 121, as if fully set forth herein.

123.    CERCLA § 107(a)(1)–(4)(B) empowers "any . . . person" to recover "necessary costs of response" incurred "consistent with the national contingency plan," plus interest, "notwithstanding any other provision or rule of law."  42 U.S.C. §§ 9607(a)(1)–(4)(B).  In the event of a (1) a release or threatened release, (2) from a facility, (3) of a hazardous substance, (4) which causes incurrence of response costs, persons incurring response costs can recover from any entity that falls within the four categories of parties deemed liable under CERCLA.  Id.

124.    The four classes of liable parties under CERCLA include:  (1) the current owner or operator of a facility, (2) any person who owned or operated any facility at the time of disposal of hazardous substances, (3) any person who

arranged for disposal or treatment of hazardous substances, and (4) any person who accepts hazardous substances.  42 U.S.C. §§ 9607(a)(1)–(4).

125.  "Hazardous substances" under CERCLA are listed in 40 C.F.R. § 302.4 and include substances that EPA has listed, or with respect to which EPA has taken action, under a variety of other environmental laws.  42 U.S.C. §§ 9601(14)(A), (C)–(F).

126.  The Site is a "facility" within the meaning of CERCLA § 101(9) because it is a place "where a hazardous substance has been deposited, stored, disposed of or placed, or otherwise come to be located."  42 U.S.C. § 9601(9).

127.  Cyanide, fluoride, PAHs, and other substances found throughout the Site are "hazardous substances" within the meaning of CERCLA § 101(14).  42 U.S.C. § 9601(14).

128.  Defendant Arco is a "person" within the meaning of CERCLA § 101(21).  42 U.S.C. § 9601(21).

129.  Defendant Arco "owned" and/or "operated" the Site at the time of disposal of hazardous substances within the meaning of CERCLA §§ 101(20)(A), 107(a)(2).  42 U.S.C. §§ 9601(20)(A), 9607(a)(2).

130.  The presence of cyanide, fluoride, PAHs, and other hazardous substances in, around, and under the West Landfill, Center Landfill, Wet Scrubber Sludge Pond, North Percolation Ponds, Paste Plant and Raw Materials Area, South

Percolation Ponds, and other areas throughout the Site, constitute a release or threatened release of hazardous substances as defined in CERCLA §§ 101(22) and 107(a).  42 U.S.C. §§ 9601(22), 9607(a).

131.   The release and disposal of hazardous substances at the Site have caused Plaintiff to incur necessary costs of response within the meaning of CERCLA §§ 101(25) and 107(a)(4)(B).  42 U.S.C. §§ 9601(25), 9607(a)(4)(B).

132.   Plaintiff has incurred at least $7 million in CERCLA response costs to date and will continue to incur further CERCLA response costs.

133.   CFAC's costs were incurred in connection with the investigation, assessment, and monitoring of an environmental threat at the Site, and were consistent with the National Contingency Plan as set forth in 40 C.F.R. § 300.

134.   Under 42 U.S.C. § 9607(a)(4), Arco is strictly, and jointly and severally, liable to CFAC for the response costs that CFAC incurred as a consequence of the release or threatened release of hazardous substances into the environment from the Site.

## SECOND CLAIM FOR RELIEF
### (Contribution under CERCLA § 113(f))

135.   CFAC realleges and incorporates by reference the allegations in paragraphs 1 through 134, as if fully set forth herein.

136.   Arco is a person not party to the AOC within the meaning of CERCLA § 113(f)(3)(B).  42 U.S.C. § 9613(f)(3)(B).

137.   The Site is a "facility" within the meaning of CERCLA § 101(9) because it is a place "where a hazardous substance has been deposited, stored, disposed of or placed, or otherwise come to be located."  42 U.S.C. § 9601(9).

138.   Defendant Arco "owned" and/or "operated" the Site at the time of disposal of hazardous substances within the meaning of CERCLA §§ 101(20)(A), 107(a)(2).  42 U.S.C. §§ 9601(20)(A), 9607(a)(2).

139.   The presence of cyanide, fluoride, PAHs, and other hazardous substances in, around, and under the West Landfill, Center Landfill, Wet Scrubber Sludge Pond, North Percolation Ponds, Paste Plant and Raw Materials Area, South Percolation Ponds, and other areas throughout the Site, constitute a release or threatened release of hazardous substances as defined in CERCLA §§ 101(22) and 107(a).  42 U.S.C. §§ 9601(22), 9607(a).

140.   Pursuant to the AOC, CFAC has resolved its liability to the United States within the meaning of 42 U.S.C. §§ 9613(f)(2) and 9622(h)(4).

141.   Pursuant to the AOC, CFAC has incurred and will continue to incur response costs as a consequence of the release or threatened release of hazardous substances at the Site consistent with the National Contingency Plan as defined in 40 C.F.R. § 300.700(c).

142.   Under 42 U.S.C. § 9613(f)(3)(B), CFAC is entitled to contribution from Arco for its equitable portion of the response costs incurred and for future response costs to be incurred under the AOC.

### THIRD CLAIM FOR RELIEF
### (Declaratory Judgment Under CERCLA § 113(g))

143.   CFAC realleges and incorporates by reference the allegations in paragraphs 1 through 142, as if fully set forth herein.

144.   Because the extent and magnitude of the contamination in, around, and under the Site, including, but not limited to, the West Landfill, Center Landfill, Wet Scrubber Sludge Pond, North Percolation Ponds, Paste Plant and Raw Materials Area, and South Percolation Ponds, is not yet fully known, and because the contamination has not yet been fully mitigated, CFAC will incur further necessary response costs, which may include (but not be limited to) additional investigatory, remedial and removal expenses.

145.   There is a present and actual controversy between CFAC and Arco concerning their respective rights and obligations with respect to the response costs associated with the releases of hazardous substances at the Site.

146.   Pursuant to 42 U.S.C. § 9613(g)(2), CFAC is entitled to a declaratory judgment establishing Arco's liability for response costs that CFAC shall incur in the future.

147.   CFAC further requests that this Court, after entering the declaratory judgment, retain jurisdiction of this action to grant CFAC such further relief against Arco as necessary and proper to effectuate the Court's declaration.

## FOURTH CLAIM FOR RELIEF
### (Contribution Under CECRA, § 75-10-724)

148.   CFAC realleges and incorporates by reference the allegations in paragraphs 1 through 147, as if fully set forth herein.

149.   The Site is a "facility" as that term is defined in Montana Code Annotated § 75-10-701(4).

150.   Arco is a "person" as that term is defined in Montana Code Annotated § 75-10-701(16).

151.   The cyanide, fluoride, PAHs, and other substances, in, around, and under the West Landfill, Center Landfill, Wet Scrubber Sludge Pond, North Percolation Ponds, Paste Plant and Raw Materials Area, South Percolation Ponds, and other areas throughout the Site, qualify as "hazardous or deleterious substance[s]" under Montana Code Annotated § 75-10-701(8).

152.   On July 31, 2014, CFAC received notice consistent with Montana Code Annotated § 75-10-711.

153.   CFAC has paid and will continue to pay more than its equitable share of remedial action costs at the Site.

154.   Pursuant to Montana Code Annotated § 75-10-724, CFAC is entitled to contribution from Arco for an equitable allocation (all or some portion) of the remedial action costs incurred as a consequence of the release or threatened release of hazardous or deleterious substances into the environment at the Site.

## FIFTH CLAIM FOR RELIEF
### (Declaratory Judgment Under CECRA)

155.   CFAC realleges and incorporates by reference the allegations in paragraphs 1 through 154, as if fully set forth herein.

156.   The Site is a "facility" as that term is defined in Montana Code Annotated § 75-10-701(4).

157.   Arco is a "person" as that term is defined in Montana Code Annotated § 75-10-701(16).

158.   The cyanide, fluoride, PAHs, and other substances, in, around, and under the West Landfill, Center Landfill, Wet Scrubber Sludge Pond, North Percolation Ponds, Paste Plant and Raw Materials Area, South Percolation Ponds, and other areas throughout the Site, qualify as "hazardous or deleterious substance[s]" under Montana Code Annotated § 75-10-701(8).

159.   On July, 31, 2014, CFAC received notice consistent with Montana Code Annotated § 75-10-711.

160.   Because the extent and magnitude of the contamination in, around, and under the Site, including, but not limited to, the West Landfill, Center Landfill,

Wet Scrubber Sludge Pond, North Percolation Ponds, Paste Plant and Raw

Materials Area, and South Percolation Ponds, is not yet fully known, and because

the contamination has not yet been fully mitigated, CFAC will incur further

necessary remedial action costs, which may include (but not be limited to)

additional investigatory, remedial and removal expenses.

161.   CFAC has paid and will continue to pay more than its equitable share

of remedial action costs at the Site.

162.   Pursuant to Montana Code Annotated § 75-10-724, CFAC is entitled

to a declaration as to Arco's liability for an equitable allocation (all or some

portion) of the remedial action costs to be incurred as a consequence of the release

or threatened release of hazardous or deleterious substances into the environment

at the Site.

**WHEREFORE**, CFAC requests the Court enter judgment as follows:

1.   On the First Claim for Relief, damages and prejudgment interest

against Arco in an amount to be proven at trial.

2.   On the Second Claim for Relief, damages and prejudgment interest

against Arco in an amount to be proven at trial.

3.   On the Third Claim for Relief, a declaration that Arco is responsible

and liable for any and all remedial action costs and response costs at the Site, plus

interest.

4.     On the Fourth Claim for Relief, damages and prejudgment interest against Arco in an amount to be proven at trial.

5.     On the Fifth Claim for Relief, a declaration that Arco is wholly responsible and liable for any and all remedial action costs and response costs at the Site, plus interest.

6.     For its reasonable costs and attorneys' fees incurred herein; and

7.     For such other relief as the Court deems just and proper.

Dated this 13th day of July, 2018

By */s/ Catherine A. Laughner*

BROWNING, KALECZYC, BERRY & HOVEN, P.C.
 W. John Tietz
 Catherine A. Laughner
800 Last Chance Gulch
Helena, Montana 59601
Tel:  (406) 443-6820
Fax:  (406) 443-6883

CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
 Eliot Lauer (*pro hac vice* pending)
 Charles B. Howland (*pro hac vice* pending)
 Michael P. Jones (*pro hac vice* pending)
101 Park Avenue
New York, New York 10178-0061
Tel:  (212) 696-6000
Fax:  (212) 697-1559

*Attorneys for Plaintiff*
*Columbia Falls Aluminum Company, LLC*