IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| COLUMBIA FALLS ALUMINUM COMPANY, LLC, <br><br> Plaintiff, <br><br> vs. <br><br> ATLANTIC RICHFIELD COMPANY, <br><br> Defendant. | CV 18–131–M–DWM <br><br> OPINION and ORDER |

This action arises out of a dispute between Plaintiff Columbia Falls Aluminum Company, LLC ("CFAC") and Defendant Atlantic Richfield Company ("Arco") over the parties' respective environmental liabilities at an aluminum smelter in Columbia Falls, Montana ("the Site"). CFAC sued under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") and its state analog (the Montana Comprehensive Environmental Cleanup and Responsibility Act, or "CERCA"), seeking cost recovery and contribution for its liability as the current owner of the Site. (Compl., Doc. 1.) Arco counterclaimed, (Doc. 23), and filed a motion for judgment on the pleadings, seeking dismissal of CFAC's claims based on contractual indemnity, (Doc. 33). The Court heard argument on April 10, 2019. The motion is denied.

1

## FACTUAL BACKGROUND

In 1955, The Anaconda Company, Arco's predecessor, completed construction of, and began production of aluminum at, the Site. (Doc. 1 at ¶¶ 11, 12.) From 1955 to 1985, Arco produced approximately 3,523,501 tons of aluminum at the Site using the Hall-Heroult process. (*Id.* at ¶ 13.) The Hall-Heroult process is an electrolytic reduction process that dissolves alumina in a cryolite bath inside of carbon-lined cells, or "pots." (*Id.*) A powerful electric current is passed through the bath from an anode at the top to a cathode at the bottom, which separates the aluminum metal from the chemical solution. (*Id.* at ¶ 14.) This process resulted in the production of several waste streams which were discharged in various areas at the Site. (*Id.* at ¶¶ 15–16.) Spent "potliners" from pots that failed contained hazardous substances and were also regularly disposed at the Site. (*Id.* at ¶¶ 17, 18.) According to CFAC, Arco discharged waste at numerous locations during its operation of the facility. (*See, e.g., id.* at ¶¶ 16–21 (describing West Landfill).)

In 1985, Arco formed Columbia Falls Aluminum Company ("CFAC Montana"). (*Id.* at ¶ 45.) That same year, Montana Aluminum Investors Corp. ("Montana Aluminum") acquired Arco's assets related to the Site and purchased all of CFAC Montana's stock for $1.00 ("the Acquisition Agreement"). (*Id.* at ¶ 46; Doc. 23-1.) As of 1999, by subsequent mergers, CFAC is the successor-in-

interest to Montana Aluminum and CFAC Montana under the Acquisition Agreement. (Doc. 1 at ¶¶ 47, 49.) CFAC operated the smelter until 2009. (*Id.* at ¶ 50.) According to CFAC, it and its predecessors' operation of the Site "caused substantially fewer releases or threatened releases of hazardous substances than Arco's ownership and operation." (*Id.* at ¶ 51.)

On March 5, 2013, the United States Environmental Protection Agency (the "EPA") began an investigation of the Site for possible listing on the National Priorities List. (*Id.* at ¶ 59.) CFAC also began investigating the Site, (*id.*), and was in communication with the Montana Department of Environmental Quality ("Montana DEQ") regarding the Site. (*Id.* at ¶¶ 61–66.) On or about June 9, 2015, Arco and CFAC each received a General Notice Letter and Demand for Payment of Response Costs for the Site from the EPA. (*Id.* at ¶ 70.) CFAC sent a letter to the EPA on June 25, 2015, accepting the EPA's invitation to negotiate an Administrative Order on Consent to conduct a remedial investigation and feasibility study at the Site. (*Id.* at ¶ 72.) Arco, however, rejected the EPA's invitation to engage in negotiations. (*Id.* at ¶ 73.) On November 30, 2015, CFAC entered into an Administrative Order on Consent ("the Administrative Order") with the EPA concerning the Site. (*Id.* at ¶ 78.) Pursuant to the Administrative Order, CFAC is conducting a remedial investigation and feasibility study at the Site. (*Id.*) That investigation resulted in a February 2017 "Phase I" report,

3

indicating the Site had three primary contaminant concerns: (1) cyanide, (2) fluoride, and (3) polycyclic aromatic hydrocarbons ("PAHs"), primarily in the areas of the Site used for disposal under Arco. (*Id.* at ¶¶ 81–118.) CFAC alleges that it has incurred at least $7 million in response costs to date, (*id.* at ¶ 119), and that additional costs are expected, (*id.* at ¶ 120). Arco has not reimbursed CFAC for any costs. (*Id.* at ¶ 121.) As a result, CFAC filed the present action, seeking CERLCA contribution and recovery costs from Arco.

## LEGAL STANDARD

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "A judgment on the pleadings is properly granted when, assuming the truth of the allegations in the non-moving party's pleadings, the moving party is entitled to judgment as a matter of law." *Rubin v. United States*, 904 F.3d 1081, 1083 (9th Cir. 2018). As with a motion under Rule 12(b)(6), a successful Rule 12(c) motion must show either that the complaint lacks a cognizable legal theory or fails to allege facts sufficient to support its theory. *Dworkin v. Hustler Magazine Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989); *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988). The determination of a Rule 12(c) motion is limited to the pleadings, *see* Fed. R. Civ. P. 12(d), including attached documents, *see* Fed. R. Civ. P. 10(c); *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

## ANALYSIS

Parties may contractually assign CERCLA and other environmental liabilities to other private individuals through an indemnification agreement. 42 U.S.C. § 9607(e)(1); *see Mardan Corp. v. C.G.C. Music, Ltd.*, 804 F.2d 1454, 1459 (9th Cir. 1986). Here, Arco argues that the parties have done so in the Acquisition Agreement, foreclosing the present lawsuit. Because the Acquisition Agreement is attached to the Answer, (*see* Doc. 23-1), it can be considered for the purposes of the present motion. *See Ritchie*, 342 F.3d at 908.

### I. Applicable Law

State law "provide[s] the general content of federal law" on the scope of contractual indemnity under CERCLA. *See Mardan Corp.*, 804 F.2d at 1460; *see also Jones-Hamilton Co. v. Beazer Materials & Servs., Inc.*, 973 F.2d 688, 692 (9th Cir. 1992). Montana law therefore governs the interpretation of the contract provisions at issue here. (*See* Doc. 23-1 at § 13(h).) Under Montana law, an indemnity agreement is interpreted like any other contract and a court's job "is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted.'" *Ohio Farmers Ins. Co. v. JEM Contracting, Inc.*, 386 P.3d 613, 616 (Mont. 2016) (quoting Mont. Code Ann. § 1–4–101). "The role of a court interpreting a contract

provision is to ascertain and effectuate the parties' mutual intentions[,]" which is reflected in "[t]he clear and explicit language of the contract." *A.M. Welles, Inc. v. Mont. Materials, Inc.*, 342 P.3d 987, 989 (Mont. 2015). "To the extent that there is ambiguity, indemnity clauses generally should be liberally construed in favor of the party intended to be indemnified." *Id.* (internal quotation marks omitted). "[A]n ambiguity exists only if the language is susceptible to at least two reasonable but conflicting meanings." *Mary J. Baker Revocable Tr. v. Cenex Harvest States, Co-ops, Inc.*, 164 P.3d 851, 857 (Mont. 2007). "[I]f the language of a contract is ambiguous, a factual determination must be made as to the parties' intent in entering into the contract." *Id.* "[E]vidence of the circumstances under which the contract was made and the matter to which it relates may [also] be considered." *Id.* "However, such evidence . . . is not admissible to add to, vary, or contradict the terms of the contract." *Id.*

## II. The Acquisition Agreement

The Acquisition Agreement contains cross-indemnification provisions allocating the respective obligations of Seller (Arco) and Buyer (CFAC) for liability relating to the Site before and after it was sold. (*See* Doc. 23-1.) Section 10(b)(iii) governs CFAC's indemnity obligation, stating CFAC will:

> indemnify and hold Seller [Arco] harmless from and against . . . [a]ll damages, losses, and out-of-pocket expenses arising out of the Assumed Liabilities or out of obligations or liabilities, contingent or otherwise, relating to the operation of the Smelter Business after the

6

> Closing Date, other than obligations or liabilities as to which Seller is obligated to indemnify Buyer pursuant to Section 10(a)(iii).

The Agreement defines "Smelter Business" as "the business associated with Seller's Columbia Falls, Montana aluminum smelter." (*Id.* at Preamble.) It explains that the phrase "relating to the Smelter Business" when "used with respect to any . . . liability of Seller [Arco]" is "intended to designate those . . . liabilities that . . . are associated with the conduct of the Smelter Business." (*Id.* at § 1(a).) The Closing Date was September 17, 1985. (*Id.* at § 1(g).)

Section 10(a)(iii) of the Agreement governs Arco's indemnification obligations to CFAC and states that Arco will: "indemnify and hold Buyer [CFAC] harmless from and against . . . [a]ll damages, losses, and out-of-pocket expenses . . . caused by or arising out of obligations or liabilities relating to the Smelter Business resulting from events or conditions in existence prior to the Closing Date." (*Id.* at § 10(a)(iii).) But, Arco's indemnity expired after five years: "Buyer [CFAC] may not make a claim with respect to . . . Seller's indemnity referred to in clause (iii) of this Section 10(a) at any time after August 31, 1990," except as to certain tax matters. (*Id.* at § 10(a).) The Agreement also states that it "reflects the entire agreement between the parties, and there are no prior agreements, understandings, representations, or warranties between the parties other than those set forth in this Agreement." (*Id.* at § 13(e).)

## III. Indemnification Obligations

Based on this indemnification language, Arco argues that CFAC assumed broad liability for all contingencies, including CERCLA liability, as of September 1, 1990. CFAC, on the other hand, argues that the mere expiration of Arco's indemnification obligation did not expand CFAC's. Both parties insist that the plain language of the Acquisition Agreement unambiguously supports their respective positions. The parties' arguments, however, emphasize that the Agreement is susceptible to more than one reasonable interpretation, making it ambiguous. And, because that ambiguity cannot be resolved at this stage of proceedings, Arco's motion is denied.

### A. Accrual of Liability

Arco first argues that the "obligations and liabilities" for which CFAC seeks contribution did not accrue until 2015, when the EPA issued an order, or at the earliest, 2013, when CFAC allegedly first incurred investigation expenses in response to the EPA's inquiries. According to Arco, "[t]he CERCLA liability at issue and CFAC's contribution claim did not arise from pre-closing events, but rather from [the] EPA's post-closing CERCLA action." (Doc. 34 at 17.) This argument is unpersuasive. "While the incursion of remediation costs may be one required element in asserting a private action under CERCLA, it is not controlling of when [a] claim . . . arose . . . ." *Goodyear Tire & Rubber Co. v. Lockheed*

8

*Martin Corp.*, 2014 WL 4852129, at *7 (N.D. Ohio Sept. 29, 2014).

As was the case in *Goodyear*, the language of the parties' agreement distinguishes liabilities arising out of "events or conditions in existence prior to the Closing Date," (Doc. 23-1 at § 10(a)(iii)), and "the operation of the Smelter Business after the Closing Date," (*id.* at § 10(b)(iii)). The agreement therefore allocates liability according to when the hazardous release occurred, not when the EPA's investigation began. This is distinguishable from *Foskett v. Great Wolf Resorts, Inc.*, the case relied on by Arco. 518 F.3d 518 (7th Cir. 2008). In *Foskett*, an individual was injured while at a water park and sued both the owner and the prior owner. The court determined the owners' agreement "show[ed] that the parties intended to allocate risk of tort liability based on who had control over the water park facilities when the claim arose," and the claim did not accrue until the accident occurred. *Id.* at 523. Here, unlike the tort liability in *Foskett*, Arco's pre-closing release of hazardous substances triggered its potential CERLCA contribution liability, not anything CFAC did or could have done as it continued to operate at the Site. As a result, CERCLA liability is based on pre-closing conditions that existed at the time Arco controlled the Site.

### B. Cross-Indemnification

Arco argues that even if the liability at issue is based on pre-closing conditions, all liability for environmental conditions at the Site shifted to CFAC

9

five years after the Closing Date. In response, CFAC insists that "the mere fact that Arco is *not* obligated to indemnify CFAC for a particular liability does not mean CFAC *is* obligated to indemnify Arco for that liability." (Doc. 35 at 28.) Thus, the question is whether the Acquisition Agreement shifted all existing and continuing environmental liability to CFAC as of 1990.

Contrary to the position taken by both parties, the plain language of the contract does not answer this question.[1] Two parts of the contract imply CFAC assumed all liability after 1990. First, the language of CFAC's indemnification provision indicates an overlap between its indemnity obligations and Arco's. While CFAC assumes "[a]ll damages, losses, and out-of-pocket expenses arising out of . . . obligations or liabilities, contingent or otherwise, relating to the operation of the Smelter Business after the Closing Date," the provision clarifies "*other than* obligations or liabilities as to which Seller is obligated to indemnify Buyer pursuant to Section 10(a)(iii)." (Doc. 23-1 at § 10(b)(iii) (emphasis added).) This language would be superfluous if there were no overlapping liability. Second, the sunset provision for Arco's indemnification obligation explicitly states that "Buyer [CFAC] may not make a claim with respect to . . . Seller's [Arco] indemnity referred to in clause (iii) of this Section 10(a) at any time after August

---

[1] Because the parties argue only the plain language of the Agreement, the Court did not independently assess any extrinsic evidence attached to the pleadings.

10

31, 1990." (Doc. 23-1 at § 10(a).) Neither the final sentence of § 10(b)(iii) nor the sunset provision in § 10(a) would have any effect if Arco's liability continued indefinitely. *Peeler v. Rocky Mtn. Log Homes Canada, Inc.*, 431 P.3d 911, 920 (Mont. 2018) (requiring courts to "construe particular provisions in the context of the agreement as a whole, giving consistent meaning and effect to all provisions as possible").

However, the parties' agreement does not mention environmental liability, contingent or otherwise. The mere absence of a reference to environmental matters does not preclude the transfer of CERCLA liability if the indemnification provision at issue is of sufficient breadth to cover CERCLA-type environmental liability. *See Horsehead Indus., Inc. v. Paramount Comms., Inc.*, 258 F.3d 132, 143 (3d Cir. 2001) (collecting cases); *White Consol. Indus., Inc. v. Westinghouse Elec. Corp.*, 179 F.3d 403, 410 (6th Cir. 1999) (agreeing to assume "[a]ll obligations and liabilities of the Business, contingent or otherwise, which are not disclosed or known to [seller] on the Closing Date and are not discovered by [buyer] within a period of one year from the Closing Date"); *John S. Boyd Co., Inc. v. Bos. Gas Co.*, 992 F.2d 401, 406 (1st Cir. 1993) ("To transfer CERCLA liability, the Agreement must contain language broad enough to allow us to say that the parties intended to transfer either contingent environmental liability, or all liability."); *Olin Corp. v. Consol. Aluminum Corp.*, 5 F.3d 10, 15 (2d Cir. 1993) (indemnifying

11

against "all liabilities, obligations and indebtedness of [indemnitee] related to its aluminum business as they exist on the Closing Date or arise thereafter" and stating that the indemnitor "agreed to 'indemnify [indemnitee] against, all liabilities (absolute or contingent), obligations and indebtedness of [indemnitee] related to the aluminum business as they exist on the Effective Time or arise thereafter with respect to actions or failures to act occurring prior to the Effective Time.'" (internal alterations omitted)). Thus, the question is one of breadth.

Arco insists that the parties purposefully drafted the indemnification language broadly enough to include potential CERCLA liability and that if the parties meant to exclude CERCLA or environmental liability, "it would have been easy for them to manifest it in the contract's language." *A.M. Welles, Inc.*, 342 P.3d at 990. For example, the parties explicitly delineated their continuing obligations in other highly regulated fields, such as workers' compensation, (*see* Doc. 23-1 at § 7(d)), and tax, (*see id.* at § 8(a), (c), (d)). The only reference to hazardous materials in the Agreement is with respect to permits for waste production and disposal. (*See* Doc. 23-1 at Schedule 3(k).) The situation, according to Arco, is thus one where two sophisticated business entities agreed to broad indemnification. *See White Consol.*, 179 F.3d at 410; *SmithKline Beecham Corp. v. Rohm & Hass Co.*, 89 F.3d 154, 161 n.3 (3d Cir. 1996).

But, the contractual language alone is not as broad as Arco posits.[2] While the Agreement does not include any express "non-assumption of liabilit[y]" language, *see Trinity Indus., Inc. v. Greenlease Holding Co.*, 903 F.3d 333, 350–51 (3d Cir. 2018), CFAC's assumption is limited by the language "relating to the operation of the Smelter Business after the Closing Date." It is not clear that the parties intended pre-existing CERLCA liability to fall within the gambit of the Smelter's future "operation." Additionally, § 1(b) of the Agreement outlines CFAC's "Assumed Liabilities," which includes those valued under $100,000 for services to be performed within one year. While that section is not directly at issue

---

[2] CFAC argues that Arco is essentially seeking a release from CERCLA contribution, which should be strictly construed under Montana law. *See Sperry v. Mont. St. Univ.*, 778 P.2d 895, 898 (Mont. 1989) (explaining a release must be "unambiguous, explicit, and unequivocal"). Arco, on the other hand, insists that the indemnification provision must be broadly construed in its favor under Montana law. *See A.M. Welles, Inc.*, 342 P.3d at 989. CFAC is correct that the distinction between releases and indemnity is complicated in the CERCLA contribution context because "[a] person who has a right of indemnity against another person . . . is not subject to liability for contribution to that person." *See* Am. Jur. 2d Contribution § 2 (2d 2015); *see also St. Farm Fire & Cas. Co. v. Bush Hog, LLC*, 219 P.3d 1249, 1252 (Mont. 2009) ("The remedies of contribution and indemnity are mutually exclusive . . . ."). However, these competing canons of construction "are of little consequence when the agreement in question has been negotiated at arm's length between the representatives of two sophisticated business entities." *Hatco Corp. v. W.R. Grace & Co. Conn.*, 59 F.3d 400, 406 (3d Cir. 1995) (internal quotation marks omitted); *see also SmithKline Beecham Corp.*, 89 F.3d at 161 n.3 (discussing the tension between the ordinary rule of broad construction and the exception of strict construction in cases involving a party's own negligence in the CERLCA context, but ultimately declining to decide the issue because contract in question was unambiguous).

here, the fact that the Agreement so specifically outlined short-term liabilities valued under $100,000 contradicts the likelihood that CFAC implicitly agreed to assume millions of dollars in CERCLA liability decades later. *See Peeler*, 431 P.3d at 920. CFAC's indemnification obligation could reasonably be interpreted not to include pre-existing environmental conditions.

This Court reached a similar conclusion in *Stimson Lumber Co. v. International Paper Co.*, 2011 WL 1532411 (D. Mont. Feb. 28, 2011) (Lynch, J.), *adopted by* 2011 WL 1549305 (D. Mont. Apr. 22, 2011). In *Stimson*, the parties disputed CERCLA liability related to polychlorinated biphenyls found in cooling ponds at the Bonner Mill Site. 2011 WL 1532411, at *1. The primary dispute was whether Stimson assumed all environmental liabilities at the site following the ten-year expiration of International Paper's indemnification obligation. Judge Lynch denied summary judgment because the agreement did not expressly state that Stimson was to assume International Paper's statutory environmental liabilities once the indemnification period ended and the base price clause in the agreement stated that Stimson "shall not assume or be responsible for any liabilities or obligations" of International Paper. *Id.* at *8; *compare with Armotek Indus., Inc. v. Freedman*, 790 F. Supp. 383, 392 (D. Conn. 1992) (concluding "it is clear from the unambiguous language of the Agreement that the parties allocated the risk of all liabilities arising from violations of environmental laws, regulations, and

ordinances"). The issue here is similar: whether CFAC assumed Arco's CERCLA liability following the expiration of Arco's five-year indemnification period given the "relating to the operation of the Smelter Business after the Closing Date" limitation.

Thus, the indemnity provision is ambiguous, and it is not possible to ascertain the intent of the parties at this stage of the proceeding. Rather, "a factual determination must be made as to the parties' intent in entering into the contract." *Mary J. Baker Revocable Tr.*, 164 P.3d at 857.

### CONCLUSION

Accordingly, IT IS ORDERED that Arco's motion for judgment on the pleadings (Doc. 33) is DENIED.

DATED this 11th day of April, 2019.

12:54 P.M.

Donald W. Molloy, District Judge
United States District Court