IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| COLUMBIA FALLS ALUMINUM COMPANY, LLC, | CV 18–131–M–DWM |
| Plaintiff, | |
| vs. | OPINION and ORDER |
| ATLANTIC RICHFIELD COMPANY, | |
| Defendant. | |

This action arises out of a dispute between Plaintiff Columbia Falls
Aluminum Company, LLC ("CFAC") and Defendant Atlantic Richfield Company
("Arco") over the parties' respective environmental liabilities at an aluminum
smelter in Columbia Falls, Montana ("the Site").  CFAC sued under the
Comprehensive Environmental Response, Compensation, and Liability Act
("CERCLA") and its state analog (the Montana Comprehensive Environmental
Cleanup and Responsibility Act, or "CECRA"), seeking cost recovery and
contribution for its liability as the current owner and operator of the Site.  (Doc. 1.)
Arco counterclaimed, (Doc. 23), and now seeks to stay this matter pending the
Environmental Protection Agency's ("EPA") selection of a final remedy for the
Site, (Doc. 73).  CFAC opposes the motion.  (Doc. 76.)  The motion is denied.

1

# BACKGROUND

## I.     CERCLA Remedies

CERCLA was enacted "to address the serious environmental and health risks posed by industrial pollution." *Atl. Richfield Co. v. Christian*, 140 S. Ct. 1335, 1345 (2020) (internal quotation marks omitted).  To "ensure that the costs of such cleanup efforts are borne by those responsible for the contamination," the Act makes responsible parties "jointly and severally liable for the full cost of the cleanup, but [they] may seek contribution from other responsible parties." *Id.* at 1345–46 (internal quotation marks and alteration omitted).

The EPA follows a prescriptive regulatory framework to determine how a specific site will be remediated.  First, it undertakes or oversees a Remedial Investigation/Feasibility Study ("the investigation") of the contamination to "evaluate alternatives to the extent necessary to select a remedy."  40 C.F.R. § 300.430(a)(2).  The purpose of the investigation "is to collect data necessary to adequately characterize the site for the purpose of developing and evaluating effective remedial alternatives." *Id.* § 300.430(d)(1).  Next comes the feasibility study, the "primary objective" of which "is to ensure that appropriate remedial alternatives are developed and evaluated such that relevant information concerning the remedial action options can be presented to a decision-maker and an appropriate remedy selected." *Id.* § 300.430(e)(1).  Once the investigation and the

2

feasibility study are complete, the EPA's "selection of a remedial action" occurs using a "two-step process." *Id.* § 300.430(f)(1)(ii).  First the agency presents the proposed remedy to the public for review and comment in a "proposed plan," and second, the agency considers the comments and, in consultation with the state, makes a "final remedy selection decision," which is documented in a Record of Decision ("ROD"). *Id.*  Only then can remedial work begin. *Atl. Richfield Co.*, 140 S. Ct at 1346.

## II.    History of Site Operations

The Site is approximately 1,340 acres located two miles northeast of Columbia Falls, Montana.  (RI Report, Ex. 3, Doc. 74-4 at 23.)  Arco and its predecessor, the Anaconda Copper Mining Company, owned and operated it as an aluminum smelter from 1955 to 1985, when it was conveyed to CFAC's predecessor.  (Doc. 1 at ¶¶ 2, 11, 45–49.)  CFAC produced aluminum at the Site from 1985 until 2009, when it closed the smelter.  (*Id.* at ¶ 50.)  While "[t]here are no ongoing manufacturing or commercial activities," the Site contains building and industrial facilities, as well as seven closed landfills, one open landfill (not used since 2009), material loading and unloading areas, two closed leachate ponds, and several percolation ponds.  (Ex. 3, Doc. 74-4 at 24.)

While operational, the aluminum production process generated what is known as "spent potliners" or "SPLs", "which over the course of aluminum

3

reduction became contaminated with fluoride, cyanide, sodium, and aluminum."
(Batson Report, Ex. 2, Doc. 74-3 at 6.)  As a result, the principal "contaminants of
concern" ("COCs") at the Site are cyanide, fluoride, polycyclic aromatic
hydrocarbons ("PAHs"), and certain metals.  (*Id.* at 9.)

CFAC's experts have identified ten Site areas that contain chemicals or
contamination potentially creating a need for remedial action:

| Remediation Area | Years of Operation | Construction | Use / Type of Waste |
|---|---|---|---|
| West Landfill | Mid-1960s – 1980 | Unlined Bottom Earthen Cap 1981 Clay Cap 1992 Synthetic Cap 1994 | Used for disposal of: SPL (mid 1960s – 1970) Sanitary, MSW, scrap (steel, wood, strapping, scrap from shops) |
| Center Landfill | 1970 – 1980 | Unlined Bottom Clay Cap 1980 | Used for disposal of: SPL, sanitary, scrap from shops |
| East Landfill | 1980 – 1990 | Clay Liner Bottom Synthetic Cap 1990 | Used for disposal of: SPL (1980-1990) |
| Wet Scrubber Sludge Pond | 1955 – 1980 | Unlined Bottom Earthen Cap 1981 Partially Excavated 1998 | Used for disposal of: SPL (1955-mid 1960s); Sludge from wet scrubbers (1955-1976) |
| Former Drum Storage Area | 1980 – 1995 | Earthen unlined storage pad | Used as storage area for drums of RCRA listed wastes for shipment offsite |
| South Percolation Ponds | 1960s – 2009 | Unlined bottom (Still in use) | Used to receive wastewater from: Sewage treatment, cooling of equipment |
| North Percolation Ponds | 1955 – 2009 | Unlined Bottom (Still in use) | Used to receive wastewater from: Operations in Main Plant area |
| Soils North of Main Plant Building | 1955 – 2009 | (Soils near operations area; not an intended disposal area) | Used as facility operations area (no intentional disposal) |
| Industrial Landfill | 1980s – 2009 | Unlined Bottom Closed 2009 | Used for disposal of: Scrap metal, wood, MSW |
| Asbestos Landfill (North & South) | Late 1970s – 2009 | Unlined Bottom Earthen Cap 2009 | Used for disposal of: Asbestos |

(*Id.* at 9–10, 12.)  In addition to these ten areas, groundwater beneath the Site has also been identified as a source of contamination potentially requiring CERCLA action.  (Muno Report, Ex. 1, Doc. 74-2 at 4.)

## III.   EPA Investigation

In 2013, the EPA began investigating the Site for possible designation as a Superfund Site under CERCLA.  (Doc. 1 at ¶ 59.)  In 2015, CFAC entered into an Administrative Order on Consent with the EPA, under which CFAC agreed to perform the remedial investigation and feasibility study under the EPA's supervision.  (*Id.* at ¶ 78.)  CFAC's environmental consultant, Roux Associates, Inc. ("Roux"), developed a Remedial Investigation/Feasibility Study Work Plan regarding the Site.  (*Id.* at ¶ 65.)  On February 21, 2020, Roux completed the remedial investigation and issued its Remedial Investigation Report following EPA comments.  (Ex. 3, Doc. 74-4 (table of contents and executive summary).)  On March 18, 2020, Roux issued its Feasibility Study Work Plan.  (Ex. 4, Doc. 74-5 (table of contents and scope of work).)  A Feasibility Study Report is expected next year, but no proposed plan has been issued and the EPA has not yet solicited public comment on a remedy.  (*See* CFAC Disco. Resp., Ex. 5, Doc. 74-6 at 4; Doc. 76 at 12 (estimating March 2021).)  CFAC's expert estimates that once these steps are completed, the cost of the final remediation could range from $22.4 to $110 million.  (Ex. 1, Muno Report, Doc. 74-2 at 7–8.)  Arco's expert believes a less

extensive and less expensive remedy will be required, at an estimated cost of approximately $6 to $13 million.  (Ex. 6, Jewett Report, Doc. 75-1 at 5, 12.)

## IV.   Procedural History

CFAC filed this case in July 2018.  (Doc. 1.)  Since that time, Arco has unsuccessfully sought judgment on the pleadings, (*see* Doc. 49), and the parties have engaged in extensive discovery, "with over one-hundred and fifty thousand documents produced in the case, totaling nearly 2 million pages," (Doc. 74 at 11). Expert disclosures have also been completed, for a total of eleven retained experts and seventeen reports.  Depositions are scheduled for the summer of 2020 and the case is set for bench trial December 2, 2020, (*see* Doc. 62).

ANALYSIS

A district court has inherent power to control its docket and promote efficient use of resources "for itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936).  A court therefore has the discretion to stay proceedings when appropriate.  *Id.*; *Dependable Hwy. Express, Inc. v. Navigators Ins. Co.*, 498 F.3d 1059, 1066 (9th Cir. 2007). The party seeking the stay "must make out a clear case of hardship or inequity in being required to go forward" and only in "rare circumstances" will a stay be granted. *Landis*, 299 U.S. at 255. Relevant considerations include the extent of the delay, the type of damages, the issues that may be resolved in the interim, fairness, efficiency, and prejudice. *Am.*

6

*Reliable Ins. Co. v. Lockard*, 2018 WL 9618463, at *2 (D. Mont. Feb. 14, 2018).

Most of the considerations identified in *American Reliable* favor neither party. For example, while a ROD may not issue in the next two years, the delay would "not be indefinite" and would be "concluded within a reasonable time." *Id.* (internal quotation marks omitted). And, because CFAC seeks a contribution allocation based on prior activity for costs that have—for the most part—yet to be borne, the nature of the damages does not foreclose a stay. *See id.* Rather, the dispositive inquiry is whether the issuance of a ROD will shed necessary light on the parties' respective contribution obligations. A "stay[] may be appropriate if resolution of issues in the other proceeding would assist in resolving the proceeding sought to be stayed." *Id.* CFAC argues that the issuance of a ROD will not impact the Court's allocation because the parties' liability is based entirely on their prior operation and contamination of the Site, which will be used to assign "baseline shares" to each party. (Doc. 76 at 15.) Arco, on the other hand, insists that "an allocation is premature before the type of remedy and the underlying causes driving the selection of that remedy are determined." (Doc. 79 at 6 (footnote omitted).) CFAC has the better argument.

"A government approved remediation plan is not a prerequisite for the court's entry of an order of percentage liability allocation." *Dent v. Beazer Materials & Servs., Inc.*, 993 F. Supp. 923, 949 (D.S.C. 1995). Rather,

contribution is based on a number of equitable factors, such as:

> (i) the ability of the parties to demonstrate that their contribution to a discharge, release, or disposal of a hazardous waste can be distinguished;
> (ii) the amount of the hazardous waste involved;
> (iii) the degree of toxicity of the hazardous waste involved;
> (iv) the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste;
> (v) the degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste; and
> (vi) the degree of cooperation by the parties with Federal, State, or local officials to prevent any harm to the public health or the environment.

*United States v. R.W. Meyer, Inc.*, 932 F.2d 568, 576 (6th Cir. 1991) (Guy, Jr., J.,

concurring); *Boeing Co. v. Cascade Corp.*, 207 F.3d 1177, 1187 (9th Cir. 2000)

(recognizing these non-exhaustive factors); *see also B.N.S.F. v. United States*, 556

U.S. 599, 616 (2009) (analyzing scope of activity and volume and type of

contamination in reviewing apportionment determination); Mont. Code Ann. § 75–

10–750(5) (allocation factors under CECRA).  "Another relevant factor . . . is the

economic benefit associated with the releases of the hazardous substances that each

party realized." *Dent*, 993 F. Supp. at 951; *see Cadillac Fairview/California, Inc.*

*v. Dow Chem. Co.*, 299 F.3d 1019, 1026 (9th Cir. 2002).  Notably, these

considerations do not include the type of remediation executed at a particular site.

But Arco maintains that the cost allocation and overall price could vary

greatly based on the type of remediation proposed, comparing, for example, off-

site removal versus containment.  CFAC's expert appears to agree with this general

8

proposition.  Baris states in his rebuttal report: "The type and scope of response actions required at the Site cannot be determined with certainty until the [feasibility study] is complete, and the remedy for each [decision unit] is selected by USEPA and documented in a Record of Decision (ROD)." (Ex. 7, Doc. 74-8 at 7.)  Baris goes on to state that his cost estimate of $19 to $ 99 million did not include potential remedies such as the "excavation of wastes" or the "offsite disposal of the waste materials" and that doing so "would greatly increase the upper end of the cost range." (*Id.*)  But once again, the ultimate dollar cost of remediation is different from the percentage allocation for contribution.  In *Boeing Co. v. Cascade Corp.*, for example, the District of Oregon rejected the defendant's argument that factors affecting the cost of a remedy—such as the complexity of hydrogeologic settings and the volume of water to be treated—affected the contribution allocation "because liability is established by contribution to the harm, not the solution."  920 F. Supp. 1121, 1137 (D. Or. 1996), *aff'd in relevant part*, 207 F.3d 1177 (9th Cir. 2000).  Rather, the court relied on "the mass of contaminants each [party] contributed to" the site. *Id.*  This undermines Arco's argument that the type of remedy selected impacts its liability.  To the contrary, the Ninth Circuit has previously rejected the argument that a polluter can avoid paying for remediation by arguing that its activities were not a *sine qua non* of the harm and associated response costs. *Boeing Co.*, 207 F.3d at 1185.

9

Moreover, CFAC persuasively argues that the ROD itself will not necessarily alleviate this uncertainty. According to Baris, "the ROD will not discuss specifics or provide new information regarding the relative contributions of ARCO and CFAC to contamination at the Site or the responsibility of either party for such contamination, beyond which is already included in the [existing] documents." (Ex. A, Doc. 76-1 at ¶ 12.) This is because the ROD only includes cost estimates based on the remedial measures proposed in the investigation and feasibility study. (*Id.* at ¶ 11.) As a result, even after the ROD, "the actual costs of remediation will not be known until the remediation is complete." (Doc. 76 at 19.)

### CONCLUSION

Because the EPA's selection of Site-specific remedies in a ROD will not change which party is responsible for the hazardous substances requiring cleanup and may not provide the clarity Arco seeks, a stay is not warranted. Arco's motion (Doc. 73) is DENIED.

DATED this 31st day of July, 2020.

14:18 P.M.

Donald W. Molloy, District Judge
United States District Court

10