IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| COLUMBIA FALLS ALUMINUM COMPANY, LLC,<br><br>Plaintiff,<br><br>vs.<br><br>ATLANTIC RICHFIELD COMPANY,<br><br>Defendant. | CV 18–131–M–DWM<br><br>OPINION<br>and ORDER |

This action arises out of a dispute between Plaintiff Columbia Falls Aluminum Company, LLC ("CFAC") and Defendant Atlantic Richfield Company ("Arco") over the parties' respective environmental liabilities at an aluminum smelter in Columbia Falls, Montana ("the Site"). CFAC sued under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") and its state analog (the Montana Comprehensive Environmental Cleanup and Responsibility Act, or "CECRA"), seeking cost recovery and contribution for its liability as the current owner and operator of the Site. (Doc. 1.) Arco counterclaimed, (Doc. 23), and now seeks partial summary judgment on CFAC's claims, (Doc. 83). The motion is denied.

### BACKGROUND

The facts are undisputed unless otherwise noted. (*See* Docs. 85, 91, 95.)

1

Disputed facts are viewed in the light most favorable to CFAC, the nonmoving party. *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam).

## I.   Site History

Arco and its predecessor, the Anaconda Copper Mining Company, owned and operated the Site as an aluminum smelter from 1955 to 1985, when it was conveyed to CFAC's predecessor. (Doc. 91 at ¶¶ 2–4.) CFAC produced aluminum at the Site from 1985 until 2009, when it closed the smelter, and remains the current owner. (*Id.* at ¶ 5.) While "[t]here are no ongoing manufacturing or commercial activities," the Site contains building and industrial facilities, as well as seven closed landfills, one open landfill (not used since 2009), material loading areas, two closed leachate ponds, and several percolation ponds. (Doc. 74-4 at 24.)

While operational, the aluminum production process generated "spent potliners" or "SPLs,"[1] "which over the course of aluminum reduction became contaminated with fluoride, cyanide, sodium, and aluminum." (Doc. 82-1 at 10.) As a result, the principal "contaminants of concern" ("COCs") at the Site are cyanide, fluoride, polycyclic aromatic hydrocarbons ("PAHs"), and certain metals.

---

[1] Review of the briefing indicates only one of the parties read and complied with the Court's specific admonition regarding acronyms and initialisms. (*See* Doc. 44 at ¶ 23 (limiting the use of acronyms/initialisms and requiring the parties include an index identifying those used); Doc. 90 at 7.) Though some use cannot be avoided—as reflected in the limited references used herein—a surfeit of initialisms unnecessarily complicates an already complex area of the law.

(*Id.* at 11.)

## II. EPA Investigation

CERCLA was enacted "to address the serious environmental and health risks posed by industrial pollution." *Atl. Richfield Co. v. Christian*, 140 S. Ct. 1335, 1345 (2020) (internal quotation marks omitted). The Act makes responsible parties "jointly and severally liable for the full cost of the cleanup, but [they] may seek contribution from other responsible parties [PRPs]." *Id.* at 1345–46 (internal quotation marks and alteration omitted). The EPA follows a prescriptive regulatory framework to determine site remediation. It first undertakes or oversees a Remedial Investigation/Feasibility Study ("RI/FS") of the contamination to "evaluate alternatives to the extent necessary to select a remedy." 40 C.F.R. § 300.430(a)(2). Once the investigation and the feasibility study are complete, the EPA's "selection of a remedial action" occurs using a "two-step process." *Id.* § 300.430(f)(1)(ii). First, the agency presents the proposed remedy to the public for review and comment in a "proposed plan." *Id.* Second, the agency considers the comments and, in consultation with the state, makes a "final remedy selection decision," which is documented in a Record of Decision ("ROD"). *Id.* Only then can remedial work begin. *Atl. Richfield Co.*, 140 S. Ct at 1346.

In 2013, the EPA began investigating the Site for possible designation as a Superfund Site under CERCLA. (*See* Doc. 1-14.) In 2015, CFAC entered into an

Administrative Order on Consent with the EPA, agreeing to perform the remedial investigation and feasibility study under the EPA's supervision. (Doc. 91 at ¶ 7.) The EPA listed the Site on the National Priorities List ("NPL") on September 9, 2016. (*Id.* at ¶ 6.) The initial remedial investigation was completed on February 21, 2020, and the EPA subsequently approved it. (*Id.* at ¶ 8.) The feasibility study is ongoing, with an anticipated completion date in March 2021. (*Id.* at ¶ 9.) On July 22, 2020, CFAC entered into a second Administrative Order on Consent regarding the South Percolation Ponds. (*Id.* at ¶¶ 51–52.) The EPA has not yet selected the CERCLA remedial action for the Site and will not do so until after completion of the feasibility study, publication of a proposed plan, and issuance of a final Record of Decision. (*Id.* at ¶ 10.) As of April 2020, CFAC asserted that it had incurred more than $21.5 million in costs that are recoverable as past response costs under CERLCA. (*Id.* at ¶ 11.)

## LEGAL STANDARD

A party is entitled to summary judgment if it can demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is warranted where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). Only disputes over facts that might affect the outcome of the lawsuit will preclude entry of summary

judgment; factual disputes that are irrelevant or unnecessary to the outcome are not considered. *Id.* at 248.

## ANALYSIS

Arco seeks summary judgment on CFAC's CERCLA claims (First, Second, and Third Claims) to the extent those claims seek to recover certain costs. It also seeks summary judgment on CFAC's CECRA claims (Fourth and Fifth Claims) on the grounds that CFAC cannot establish the statutory prerequisite.

### I. CERCLA Claims

Arco first seeks partial summary judgment on the CERCLA claims on the ground that certain costs are not recoverable as a matter of law. Arco argues that CFAC has failed to carry its burden under CERCLA § 107(a)(4)(B) and failed to comply with CERCLA § 122(e)(6). However, a genuine factual dispute regarding the "necessity" and nature of the disputed costs forecloses summary judgment.

#### A. CERCLA § 107(a)(4)(B)

To establish a prima facie claim for recovery under § 107(a), CFAC must show: (1) that the Site is a "facility" as defined by CERLCA, 42 U.S.C. § 9601(9); (2) a "release" or "threatened release" of any "hazardous substance" from that facility has occurred, 42 U.S.C. § 9607(a)(4); (3) such release or threatened release caused CFAC to ensure response costs that were "necessary" and "consistent with the national contingency plan ["NCP"]," 42 U.S.C. § 9607(a)(4), (a)(4)(B); and (4)

Arco is within one of four classes of persons subject to liability under § 107(a). *City of Colton v. Am. Promo. Events, Inc.-W.*, 614 F.3d 998, 1002–03 (9th Cir. 2010); *see also Carson Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d 863, 871 (9th Cir. 2001). Only the third element is at issue here.

Response costs are considered "necessary" when "an actual and real threat to human health or environment exists." *City of Colton*, 614 F.3d at 1003 (internal quotation marks and alteration omitted). Additionally, such costs "are considered consistent with the NCP 'if the action, when evaluated as a whole, is in substantial compliance' with it." *Id.* (quoting 40 C.F.R. § 300.700(c)(3)(i)). The NCP sets out a detailed list of procedures and requirements promulgated by the EPA and is "designed to make the party seeking response costs choose a cost-effective course of action to protect public health and the environment." *Id.* (internal quotation marks omitted). Arco challenges three categories of costs on these grounds.

   1.   **Attorney Fees**

CFAC seeks to recover over $1.4 million in fees paid to three different law firms beginning in March 2013 and continuing into 2020. (*See* Doc. 91 at ¶¶ 12–14.) Whether attorney fees may be recoverable under CERLCA depends on whether the fees are for litigation- or remediation-based services. *Key Tronic Corp. v. United States*, 511 U.S. 809, 819–20 (1994). Litigation fees, which can include time spent on negotiations between the EPA and a private party, are not

6

recoverable. *Id.* at 820. On the other hand, "lawyers' work that is closely tied to the actual cleanup" that "significantly benefit[s] the entire cleanup and serve[s] a statutory purpose apart from the reallocation of costs" may be recoverable. *Id.* Put differently, recoverable expenses include those for services akin to those performed by "engineers, chemists, private investigators, or other professionals who are not lawyers." *Id.* "These kinds of activities are recoverable costs of response clearly distinguishable from litigation expenses." *Id.* For example, "work performed in identifying other PRP's falls into this category." *Id.*

Because there is no question that the services at issue here did not include work related to identifying PRPs, the issue is whether it is possible to say, as a matter of law, that none of the nonlitigation attorney fees were necessary to the actual cleanup. It is not. CFAC's cost request states:

| **Payee** | **Short Description of Work** | **Amount** |
|---|---|---|
| Browning, Kaleczyc, Berry & Hoven, P.C. | Legal services supporting CFAC's efforts to address releases and threatened releases of hazardous substances at the Site including, *inter alia*, EPA information requests, and negotiations and other communications with USEPA and MDEQ | $412,684.52 |
| Curtis, Mallet-Prevost, Colt & Mosle LLP | Legal services supporting CFAC's efforts to address releases and threatened releases of hazardous substances at the Site including, *inter alia*, negotiations and other communications with USEPA and MDEQ | $905,771.51 |
| Locke Lord LLP | Legal services supporting CFAC's efforts to address releases and threatened releases of hazardous substances at the Site including, *inter alia*, communications with USEPA and MDEQ regarding CFAC's response actions | $112,419.08 |

(Doc. 85-3 at 5–6.) The information in this chart, standing alone, is insufficient to show these costs are not recoverable as a matter of law. While *Key Tronic* indicates that negotiation efforts may be more properly characterized as litigation costs, *see* 511 U.S. at 820, these amounts could also include services tied to remediation. For example, CFAC's attorney affidavits indicate some of the work performed included review of environmental testing and sampling. (*See* Doc. 91-4 at ¶ 7; Doc. 91-5 at ¶ 8.) While some of that work may be tied to negotiations related to the EPA consent decree or protecting CFAC's litigation interests, it is equally possible that these nonlitigation expenses may be "closely tied to the actual cleanup." *Key Tronic*, 511 U.S. at 820. Because a genuine issue of material fact remains as to whether the nonlitigation attorney fees sought by CFAC were necessary to the containment and cleanup of hazardous releases, summary judgment is not appropriate as to these costs.

   2.   **Buildings Sold to Calbag Resources, LLC**

Arco also challenges CFAC's claimed costs related to the demolition, clearing, and decommissioning of the "Potroom Complex." The Potroom Complex describes a series of ten covered steel structures on 40 acres. (Doc. 95 at ¶¶ 69–70.) As of 2014, the Complex contained 451 smelting pots supported by concrete structures. (*Id.*) In April 2015, CFAC entered into the Asset Purchase and Demolition Agreements providing Calbag Resources, LLC would be paid in-

kind for the demolition of certain buildings. (*Id.* at ¶ 79.) In June 2015, CFAC and Calbag entered into an Administrative Order on Consent with the Montana Department of Environmental Quality ("MDEQ") that governed the removal of SPL and other hazardous wastes from the Potroom Complex. (Doc. 95 at ¶ 80; *see* Doc. 91-3.) CFAC now seeks to recover the following costs:

| Payee | Short Description of Work | Amount |
|---|---|---|
| Aqua Terra Restoration LLC | Reclamation of open pit pursuant to MDEQ Opencut Mining Permit # 2724 as part of response actions at the Site | $101,459.00 |
| Calbag Resources, LLC | Cleanup and demolition of the Main Plant buildings pursuant to the MDEQ AOC including:<br><br>Asbestos abatement;<br>Concrete crushing & backfilling;<br>Hazardous waste disposal; and<br>Solid waste disposal | $7,937,504.84<br><br>Comprised of:<br>$2,854,590.95<br>$4,810,291.00<br>$139,379.66<br>$133,243.23 |
| IRS Environmental | Removal and disposal of PCB-containing capacitors | $74,610.00 |
| Mountain States Environmental Services, Inc. | Offsite waste disposal of drums containing hazardous substances | $19,675.00 |

(Doc. 85-3 at 5–7.) The parties' briefing focuses primarily on two costs: asbestos removal and concrete removal/backfilling. Arco's fundamental challenge to these claimed costs is that they are the sole result of CFAC's business transaction with Calbag, which is independent from and not a necessary part of the CERCLA cleanup. While Arco may ultimately be correct, the record is disputed.

Arco's first argument is that CERCLA excludes removal or remedial actions "in response to a release or threat of release . . . from products which are part of the

9

structure of, and result in exposure within" a structure. 42 U.S.C. § 9604(a)(3)(B). In support of its position, Arco relies on a Ninth Circuit case wherein the court denied recovery costs incurred for the voluntary removal of asbestos during remodeling of a commercial building. *See 3550 Stevens Creek Assocs. v. Barclays Bank of Cali.*, 915 F.2d 1355, 1356 (9th Cir. 1990). In doing so, the court concluded that the asbestos insulation was "used to construct the building" and therefore its presence was not the result of "disposal" of a "solid waste or hazardous waste" as envisioned by CERCLA or its underlying intent. *Id.* at 1361–62. But *Stevens Creek* is not dispositive in this context, primarily because the Potroom Complex is connected with a larger CERCLA action. While both *Stevens* and § 9604(a)(3)(B) prevent CFAC from recovering costs predicated principally and exclusively on the presence or release of asbestos or other hazardous materials, CFAC may be able to recover costs for the incidental removal of asbestos and other hazardous materials in its necessary operations to clean up the hazardous waste at the Site. *Cf. United States v. Saporito*, 2011 WL 2473332, at *6 (N.D. Ill. June 22, 2011) (collecting cases).

Thus, the fundamental question remains whether the costs were "necessary" to the "*actual cleanup* of hazardous releases." *Young v. United States*, 394 F.3d 858, 863 (10th Cir. 2005). "It is generally agreed that this standard requires that an actual and real threat to human health or environment exist before initiating a

response action." *Carson Harbor*, 270 F.3d at 871. Costs that are undertaken for other reasons—such as routine maintenance or solely enhancing the use or value of a property—are generally not recoverable. *See Sealy Conn. Inc. v. Litton Indus., Inc.*, 93 F. Supp. 2d 177, 188–89 (D. Conn. 2000) (finding *after trial* that decision to demolish building was based on business considerations and not remediation and so plaintiff could not recover demolition costs). But, contrary to Arco's position, the necessity determination does not turn "on whether a party has a business or other motive in cleaning up the property, but whether there is a threat to human health or the environment and whether the response action is addressed to that threat." *Carson Harbor*, 270 F.3d at 872. Put differently, "[t]he issue is not why the landowner decided to undertake the cleanup, but whether it was necessary." *Id.* And, "necessity" is generally a fact question. *Cadillac Fairview/Cal., Inc. v. Dow Chem. Co.*, 840 F.2d 691, 695 (9th Cir. 1988).

CFAC has presented evidence, though disputed, that the Potroom Complex contained hazardous waste, (Doc. 95 at ¶¶ 80, 90, 86–87, 96, 102, 108), was dangerously deteriorating, (*id.* at ¶¶ 66–68), and would have been unsafe to leave in its present or decommissioned state, (*id.* at ¶¶ 107, 121). CFAC has also presented evidence that it was unlikely that the EPA's final remedy would have left the Potroom Complex undisturbed. (*See id.* at ¶¶ 78, 110, 123–24; *see also id.* at ¶¶ 81, 111–12 (parties disputing whether Complex addressed in RI/FS Workplan)).

11

These facts suggest CFAC's costs related to the cleanup of the Potroom Complex were "necessary" under the statute. "[Arco] will have ample opportunity at trial to express [its] concern that the costs incurred by [CFAC] in this case were unnecessary or inconsistent with the national contingency plan." *Cadillac Fairview/Cal.*, 840 F.2d at 695. Summary judgment is therefore inappropriate.

Arco further argues, however, that many of the facts and opinions CFAC proffered in response to the motion are not admissible evidence. (*See, e.g.*, Doc. 95 at ¶ 110.) To be sure, only evidence that could be presented in an admissible form at trial can be considered on summary judgment. *Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003). But while it challenges the admissibility of certain evidence, Arco does not unequivocally show that CFAC will be unable to present it at trial. Admissibility issues will be addressed at trial. Finally, Arco seems to argue that the costs are not recoverable because the cleanup was undertaken by Calbag, not CFAC. But the fact that fact is not dispositive because "[i]t is sufficient that the substance has the characteristic of waste . . . at the point at which it was delivered to another party." *Catellus Dev't Corp. v. United States*, 34 F.3d 748, 752 (9th Cir. 1994); *Cal. Dep't of Toxic Substances Control v. Alco Pac., Inc.*, 508 F.3d 930, 935–36 (9th Cir. 2007).

### 3. South Pond Stabilization Project

Arco also challenges CFAC's claim for costs incurred in stabilizing the

riverbank along the South Percolation Ponds: $325,256.00 to Montana Helical Piers, (Doc. 91 at ¶ 41); $241,035.61 to Morrison-Maierle Inc., (*id.* at ¶ 42); and $338,433.00 to Sandy Construction Co., Inc., (*id.* at ¶ 43). Arco argues that none of this work was approved or directed by the EPA or part of an EPA-selected response. Rather, according to Arco, the works involved "regular shoring, maintenance and construction" required to address erosion due to high water and proximity to the Flathead River. Moreover, Arco argues that some of that same work will be undone pursuant to the July 2020 Administrative Order on Consent.

Arco's arguments on this point fail for the same reason discussed above. The dispositive question is whether the costs were "necessary" and consistent with the NCP. CFAC has presented evidence that its actions involved the EPA, (*see* Doc. 95 at ¶¶ 131–37), and are recognized "stabilization" procedures under the NCP, *see* 40 C.F.R. § 300.415(e)(3). Though Arco argues to the contrary, this disputed matter must be resolved at trial.

**B.     CERCLA § 122(e)(6)**

Alternatively, Arco argues that the costs related to the Potroom Complex and the South Pond stabilization are independently barred because CERCLA § 122(e)(6) requires PRPs, such as CFAC, "to obtain EPA approval" before conducting any remedial activities once a remedial investigation and feasibility study have been initiated. *Atl. Richfield Co.*, 140 S. Ct. at 1352; 42 U.S.C.

§ 9622(e)(6). Here, the EPA initiated an investigation and study at the Site on November 30, 2015. (Doc. 91 at ¶ 7.) Thus, Arco argues any purported remedial activities CFAC conducted after that date and without EPA approval violate the statute and are necessarily inconsistent with the NCP. But the categorization of the action as either "removal" or "remedial" is disputed at this stage.

Distinguishing between "removal" and "remedial" is no simple task. In fact, the Ninth Circuit has said that "[t]he definitions of removal and remedial action exemplify th[e] muddled language [of CERCLA]." *United States v. W.R. Grace & Co.*, 429 F.3d 1224, 1238 (9th Cir. 2005). "Removal" actions are generally understood to address immediate, short-term cleanup, *see* 42 U.S.C. § 9601(23), while "remedial" actions, on the other hand, are defined as an action "consistent with permanent remedy taken instead of or in addition to removal actions," *id.* at § 9601(24). At this stage, not only do the parties dispute what type of action this is, but Arco's attempt to categorize the South Pond activities as "routine maintenance" actually cuts against its attempt to categorize those same activities as permanent, "remedial" actions. The record must be developed on this issue before the nature of the activities can be discerned with any certainty.

## II. CECRA Claims

Finally, Arco seeks summary judgment on CFAC's CECRA claims on the ground that CFAC did not satisfy the statutory prerequisite to bring a private right

14

of action under Montana law. Specifically, it did not "receive[] notice" pursuant to MCA § 75–10–711."[2] Mont. Code Ann. § 75–10–724. Although there appears to be no caselaw interpreting § 75–10–724, Arco cites *Pacific Hide and Fur Depot v. Great American Insurance Co.*, which generally states that, to give notice, MDEQ "inform[s] a party in writing" that: (1) it has been identified as a PRP; (2) it is required to "take appropriate remedial action;" and (3) "if the party is 'unable or unwilling to take action in a timely manner,' the party 'may be required to reimburse the fund for the state's remedial action costs and may be subject to penalties pursuant to this part.'" 23 F. Supp. 3d 1208, 1217 (D. Mont. 2014) (quoting § 75–10–711(b)–(c)). The record shows that such notice occurred here, though not in the strict terms argued by Arco.

CFAC's correspondence indicates that approximately one year after the EPA began its assessment of the Site, CFAC and the EPA jointly participated in conversations with MDEQ regarding potential regulatory actions under CECRA. (*See* May 23, 2014 EPA Email, Doc. 1-15.) Those discussions resulted in a draft Administrative Order on Consent proffered by MDEQ in July 2014. (*See* Docs. 1-16 and 1-17.) The cover letter for that document states: "Rather than just provide a conceptual outline, we decided that it would be more productive to give you a fully

---

[2] CFAC's response indicates that it concedes the non-applicability of the other avenues for establishing a private right of action. (*See* Doc. 94 at 14.)

15

detailed framework for addressing the release at the site through [CECRA]." (Doc. 1-18 at 2.) MDEQ also proposed a rapid schedule for turning around a final Administrative Order, if reached. (*See id.*) The cover letter concludes: "We hope that by providing a detailed proposal, we are able to eliminate any confusion or misunderstanding about the type of approach that would be required." (*Id.*) The draft Administrative Order further states:

- "[MDEQ] has listed the Facility on the CECRA Priority List pursuant to § 75–10–704(3), MCA," (Doc. 1-17 at ¶ 10);

- An April 2014 Report prepared as part of the EPA investigation revealed the presence of hazardous and deleterious substances, (*id.* at ¶¶ 20–25, 29–34);

- "[MDEQ] has determined that an imminent and substantial endangerment may exist to the public health, safety, or welfare or the environment from the releases and threatened releases of hazardous and deleterious substances at the Facility, that remedial action is necessary to abate this endangerment, and that [CFAC] is liable for necessary and remedial action under CECRA," (*id.* at ¶ 35);

- "[CFAC] shall reimburse all [MDEQ] Remedial Action Costs," (*id.* at ¶ 70);

- Penalties may be imposed for CFAC's non-compliance with the terms of the Order, (*id.* at ¶¶ 85–86).

Considering the above, the elements of "notice" identified in § 75–10–711 (fault, remedy, and possible reimbursement) are all present. Construing the notice requirement as narrowly as Arco would punish MDEQ for its thorough approach and would means that CFAC endangered its own standing to seek contribution under CECRA by being proactive in its attempt to remediate the Site. Such a

reading comports with neither the plain language of the statute nor its legislative intent. Accordingly, Arco's challenge to the CECRA claims is rejected.

## CONCLUSION

Based on the foregoing, IT IS ORDERED that Arco's motion for partial summary judgment (Doc. 83) is DENIED.

DATED this 4th day of December, 2020.

                                12:06 P.M.

Donald W. Molloy, District Judge
United States District Court